The HISTORIC GREEN SPRINGS, INC., Plaintiff,

v.

Bob BERGLAND et al., Defendants.

Civ. A. No. 77–0230–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Aug. 11, 1980.

Emanuel Emroch, Emanuel Emroch & Associates and Thomas W. Williamson, Jr., Richmond, Va., for plaintiff.

Gerald L. Baliles, D. Patrick Lacy, and John A. Gibney, Jr., Richmond, Va., for defendant Va. Vermiculite and intervenor landowners.

Stephen C. Harris, Atty. for the Commonwealth of Louisa County, Louisa, Va., for intervenor Louisa County Bd. of Supv.

Raymond A. Carpenter, Asst. U.S. Atty., Richmond, Va., Gary W. Wilburn, Lars Hanslin, Dept. of Justice, Land and Natural Resources Div., Washington, D.C., for defendants Andrus and Murtagh.

MERHIGE, Jr., District Judge.

## MEMORANDUM

This case involves the controversy surrounding the designation of approximately 14,000 acres of land in Louisa County, Virginia, known as the Historic Green Springs District, as a National Historic Landmark, its listing in the National Register of Historic Places (hereinafter "National Register"), and the acceptance by the Secretary of the Interior of preservation easements over half of the District. An explanation of the posture of the case requires a review of the proceedings, both administrative and judicial, since this suit was filed on April 26, 1977.

This action was originally filed in this Court by Historic Green Springs, Inc. (hereinafter "HGSI"), a local organization dedicated to the preservation of the District's historical qualities. HGSI filed its complaint against Virginia Vermiculite, Ltd. (hereinafter "VVL"), Secretary of Agriculture Bob Bergland, the Farmers Home Administration, and United Virginia Bank. HGSI sought to prevent the Farmers Home Administration from guaranteeing a loan from United Virginia Bank to VVL, the proceeds of which loan were to be used by VVL to finance mining operations in the Historic Green Springs District (hereinafter "District"). The basis of the complaint was that the District's listing in the National Register required compliance with certain protective procedures before such a loan guarantee could be effected.

On May 4, 1977, VVL filed a counterclaim and third–party complaint against defendant Bergland, Secretary of the Interior Cecil Andrus, and Keeper of the National Register William Murtagh. VVL challenged the District's listing in the National Register on the basis of the allegedly defective nomination of the property to the National Register by the Virginia Historic Landmarks Commission. A similar challenge was asserted by intervenors Louisa County Board of Supervisors and various owners of land within the District. Shortly thereafter, the Secretary of the Interior conceded that the state nomination of the District to the National Register was defective due to inadequate notice, but determined that because of its national historic significance, the District would remain on the Register as a National Historic Landmark. Upon motion by HGSI on May 16, 1978, the Court dismissed HGSI's complaint.

VVL and the intervening landowners (hereinafter "plaintiffs") as well as the Louisa County Board of Supervisors supplemented and amended their pleadings in order to challenge the actions of the Department of the Interior taken since the filing of the counterclaim and third–party complaint. A trial in this matter was held, at which time the federal defendants' motion for summary judgment was denied. The parties filed post–trial memoranda with the Court addressing the issues raised at trial. After reviewing such memoranda and the administrative record submitted to the Court, and finding further argument in this matter unnecessary, the Court finds the matter ripe for disposition.

## I. FACTUAL BACKGROUND

The factual background that follows, regrettably, is necessarily detailed. The Historic Green Springs District comprises an area of approximately 14,000 acres, described as roughly the size of New York's Manhattan Island. The District lies within Louisa County, Virginia, about midway between Richmond and Charlottesville. While the national significance of the District's historic qualities is disputed, the area does constitute a beautiful and remarkably well–preserved concentration of eighteenth and nineteenth century buildings of architectural merit. Most of its land is used for agricultural purposes, although some commercial development may be found there, such as a lumber company, motel, meat processing plant, and used car dealership. Most importantly, two mining companies, VVL and W. R. Grace Co., Inc., have acquired mining rights over much of the land in and around the District for the mining and processing of vermiculite. Vermiculite is used in the production of plaster and lightweight concrete construction materials, fertilizers, paints, and insulation in both residential and commercial structures. The extent of the vermiculite deposits in the District has been termed significant.

The instant controversy over the district's historic value began as early as 1972, when the Commonwealth of Virginia proposed the construction of a new prison in the District. HGSI, with the support of the District's residents, organized a successful effort to block the construction. HGSI's efforts at promoting the District's historical qualities to state officials resulted in its recognition as a Virginia Historic Landmark by the Virginia Historic Landmarks Commission. This state commission in February, 1973, nominated the District to the National Register. On March 1, 1973, the Department of the Interior (hereinafter "the Department") approved the state nomination and listed the District on the National Register.[1]

HGSI also acquired "preservation easements" over approximately half of the land in the District, which preserved the affected land by prohibiting new industrial and commercial development, limiting in some instances any construction around various historic structures, and requiring proper maintenance of historic buildings. Once acquired by HGSI, these preservation easements were offered in 1973 to the Department of the Interior. Although the Department initially rejected the proffered easements, the offer itself led to consideration of the adoption of a national program of acquiring preservation easements over national historic landmarks.

Despite the Department's rejection of the easements, its interest in the District continued. In 1974, the Secretary considered designating the District a National Historic Landmark. In April, 1974, the Department's Advisory Board on National Parks, Historic Sites, Buildings & Monuments had presented to it a report on the District by Benjamin Levy, a Department historian. Levy's report, after noting a modicum of historical events and persons associated with the District, focused on the District's architectural qualities. Replete with photographs and diagrams, the report discussed in detail the characteristics of the various

1. This listing on The National Register by state nomination was later found to have been defec-

tive for lack of adequate notice to the affected landowners.

manor houses and outbuildings said to "constitute a textbook of Virginia architecture up to the period following the Civil War." Based upon this report, the Secretary designated the District a National Historic Landmark in 1974.

After HGSI renewed its offer of the preservation easements to the Department, the Department made clear in a letter to HGSI that the easements would be accepted only as part of a national easements program then under consideration. By September, 1975, the Secretary had decided to proceed with such a national program for accepting easements on selected historic landmarks. Evidence of the Secretary's interest in accepting the Green Springs easements as part of that program can be found in his letter to the Chairman of the Board of W. R. Grace Company, Inc., in which he emphasized the Department's interest in the area in relation to the easements program and suggested that the mining company utilize its vermiculite holdings outside the District.

Although funding for a national easements program was ultimately denied, the Department proceeded with consideration of acceptance of the Green Springs easements. The Department assigned its Senior Historian, Benjamin Levy, to prepare an evaluation of the proffered easements. Levy's report, submitted in November, 1976, noted many flaws in the terms and extent of the easements, such as their failure to grant public use and access, and to prohibit in all cases subdivision and development of the land. Notwithstanding the incomplete protection facilitated by the preservation easements, Levy concluded that their acceptance was a necessary first step in preserving the District. This belief was shared by Assistant Secretary of the Interior Ronald Coleman, who by memorandum dated January 4, 1977, recommended a quick acceptance of the easements without the benefit of an environmental impact statement pursuant to the National Environmental Policy Act of 1969 (hereinafter "NEPA"), 42 U.S.C. § 4321 *et seq.*, or of the promulgation of regulations to govern easement acceptance.

On January 19, 1977, Assistant Secretary of the Interior Nathaniel Reed informed HGSI President, Elizabeth Nolting, that adoption of a policy of accepting the easements was underway. By notice in the Federal Register on March 18, 1977, the Department publicly announced the proposed acceptance of the Green Springs easements. The announcement gave notice of a public hearing on the merits of the proposal to be held on April 22, 1977, and provided for a fact sheet to be made available on request for that hearing. The hearing was held on April 22 in Louisa County at which both proponents and opponents of the proposal stated their respective positions.

Immediately following this hearing, Assistant Secretary of the Interior Robert Herbst requested that the Farmers Home Administration not guarantee a loan to VVL to finance mining operations until the Department could review the proposed mining and loan guarantee, and until the Farmers Home Administration could prepare an environmental impact statement for the operation. In addition, HGSI filed the original complaint in this action seeking to block the loan guarantee. Due to the resulting delay in the loan guarantee, VVL was forced to obtain alternate financing. In a further obvious effort to impede VVL's mining operation in the District, Assistant Secretary Herbst notified VVL on May 16, 1977, that the Department was reviewing the proposed mining pursuant to the Mining in the Parks Act, 16 U.S.C. § 1908, to determine whether the mining would cause irreparable loss or destruction to the District and, if so, how the government could mitigate such activity.

On May 18, 1977, the Department published a notice in the Federal Register announcing its procedure for acceptance of the Green Springs easements. The procedures consisted of departmental review of the easements, preparation of an environmental assessment of the proposal leading to either a negative declaration of significant environmental impact or the promulgation of an environmental impact statement, subsequent publication of such decla-

ration or statement, a public hearing in the event a negative declaration is issued, and final decision by the Secretary. The May 18 notice stated that preparation of the departmental study as well as of the environmental assessment had been accomplished, and further that a public hearing had been held in connection with that assessment. Preparation of the environmental assessment, however, had not in fact been completed at that time.

On June 8, 1977, the Department issued its environmental assessment of the easements proposal. This twenty page document detailed the history of the easements offer, the nature and terms of the easements, the effect of federal acceptance of the easements, and the Department's plans for the District. Although the environmental assessment noted that acceptance of the easements would impede state, local, and industrial development of the District in several ways, the Department issued a negative declaration stating that acceptance of the easements was not a major federal action having a significant impact on the environment. A public hearing was then scheduled for the afternoon of July 27, 1977, to receive public comment on the negative declaration.

Prompted, at least in part, by the protests of Green Springs landowners and by plaintiffs' counterclaim and third–party complaint in this action, the Department announced in the Federal Register on June 29, 1977, that it would reconsider the District's listing on the National Register as a state nomination and the District's designation as a National Historic Landmark. A public hearing was announced for the morning of July 27, 1977, for the purpose of receiving public comment on the reconsideration. By Federal Register announcement of July 18, 1977, the Department defined "reconsider" as to "determine anew, without any presumptions based on prior actions," the issues concerning the District. The Department, however, announced that the reconsideration process would not entail resubmission of the District's landmark status to the Department's Advisory Board.

While the Department's reconsideration of the District's status was pending, Assistant Secretary Herbst again wrote the Farmers Home Administration on July 19, 1977, this time in response to a request for review of the loan proposal. Herbst renewed his suggestion that the Administration prepare an environmental impact statement for the proposal, as well as submit extensive documentation of the proposed mining operation. On the same day, Herbst wrote to the Virginia State Air Pollution Control Board requesting a delay in issuance of VVL's permits until completion of the Department's Mining in the Parks Act study.

On July 27, 1977, the Department held public hearings concerning the District's listing on the National Register and its landmark designation, as well as the negative declaration of environmental impact of the easements proposal. A transcript of the morning hearing concerning the reconsideration of the District's landmark status reveals that great confusion existed over the scope of the hearing and over the action being proposed by the Department. Department officials at the hearing did not, for the most part, respond to the public's questions. By Federal Register notice of September 20, 1977, the Department announced the issuance of, and summarized, an environmental assessment and negative declaration concerning the redesignation of the District as a National Historic Landmark. The September 20 notice also clarified for the first time that the District could remain a National Historic Landmark despite a defective state nomination to the National Register.

Inter–departmental memoranda of November and December, 1977, show that the Department of the Interior had recognized that the state nomination of the District to the National Register was defective and that it had been removed from such a listing. Finally, on December 13, 1977, the Secretary of the Interior decided to redesignate the District as a National Historic Landmark on his own authority, and to accept HGSI's offer of preservation ease-

ments. The District's designation as a National Historic Landmark automatically placed it back on the National Register. 36 C.F.R. § 60.2(d)(2). These decisions were announced in the Federal Register on January 24, 1978.

Plaintiffs attacked the Secretary's decisions to designate the District as a National Historic Landmark and to accept the preservation easements on several grounds. Initially, plaintiffs challenge the Secretary's authority to designate the District and to accept easements over it pursuant to the Historic Sites, Buildings and Antiquities Act of 1935, 16 U.S.C. §§ 461 *et seq.* Plaintiffs contend that the Department of the Interior confused the standards for national significance under the Historic Sites Act of 1935 with the less strict standards of historic importance under the National Historic Preservation Act of 1966, 16 U.S.C. §§ 470 *et seq.* Arguing that the District's historical significance does not meet a level of national importance, the plaintiffs question the Secretary's authority under the Historic Sites Act of 1935 to take the administrative action challenged here.

Secondly, plaintiffs argue that the Secretary's decisions in this matter were arbitrary and capricious and violated plaintiffs' constitutional rights under the Fifth and Tenth Amendments to the Constitution of the United States. Plaintiffs contend that a finding that the Historic Green Springs District merits treatment as a National Historic Landmark was contradicted by compelling evidence of the area's lack of national significance. Further, plaintiffs assert that the restrictions placed on land in the District as a result of its landmark designation constitute a taking without just compensation in violation of the Fifth Amendment and result in impairment of the county's zoning powers over the area in violation of the Tenth Amendment.

Finally, plaintiffs argue that the administrative procedures employed by the Department, or lack thereof, since its involvement with the Green Springs area, violated basic principles of due process and administrative law, as well as provisions of the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* and NEPA. In particular, the Department's failure to promulgate either substantive or procedural regulations to govern its discretionary actions, its alleged failure to provide adequate notice to interested parties allowing for meaningful public comment, the Department's alleged bias in its handling of the District, its failure to follow its own informal regulations, and the Secretary's alleged failure to state reasons for his decisions, are all cited as procedural errors invalidating the Secretary's actions. Further, plaintiffs argue that the Department's actions concerning the District constitute rule–making under the Administrative Procedure Act, and that it failed to follow the Act's procedures governing rule–making. A final error is alleged in the Department's failure to prepare environmental impact statements under NEPA for its actions in the District.

## II. SCOPE OF REVIEW

This Court's scope of review of the administrative action challenged here is set out in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Court's inquiry is described therein as "substantial", to be based on a "thorough, probing, in–depth review" of the Secretary's decision. *Id.* at 415, 91 S.Ct. at 823. This review is broken down into three steps. First, the Court is required to decide whether the Secretary acted within the scope of his authority. *Id.*; *Schilling v. Rogers*, 363 U.S. 666, 676–77, 80 S.Ct. 1288, 1295, 4 L.Ed.2d 1478 (1960). Second, the Court must decide, pursuant to § 706(2)(A) of the Administrative Procedure Act, that the Secretary's actual decision was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Citizens to Preserve Overton Park, supra* at 416, 91 S.Ct. at 823. A corollary of this inquiry is a determination that the Secretary's action is not "contrary to constitutional right, power, privilege, or immunity" under § 706(2)(B). The third and final step is to determine whether the Secretary's action "followed the necessary procedural requirements." *Id.* at 417, 91 S.Ct. at 824.

## III. THE SECRETARY'S SCOPE OF AUTHORITY

As heretofore noted, plaintiffs argue that the Secretary's designation of the District as a National Historic Landmark, and his acceptance of preservation easements in order to protect it, were actions beyond the scope of his authority under the Historic Sites Act of 1935 (hereinafter "the 1935 Act"), 16 U.S.C. §§ 461 *et seq.* Before addressing the allegations of unauthorized action, the Court must review the legislation that forms the basis of the Secretary's actions.

The policy underlying the 1935 Act is contained in § 461 of the Act: "It is [hereby] declared that it is a national policy to preserve for public use historic sites, buildings and objects of national significance for the inspiration and benefit of the people of the United States." 16 U.S.C. § 461. In order to effectuate that policy, the Secretary of the Interior is empowered, *inter alia*, to acquire on behalf of the government any historic site, building, or object by gift, purchase, or otherwise. 16 U.S.C. § 462. Further, the Secretary is authorized, in cooperation with state and local agencies and professional individuals, to recognize and study historic landmarks of national significance not owned by the federal government. To this end, the Secretary instituted the National Historic Landmark Program. Both the acceptance of the Green Springs preservation easements and the designation of the District as a National Landmark were accomplished pursuant to the 1935 Act.

In 1966, Congress passed the National Historic Preservation Act of 1966 (hereinafter "the 1966 Act"), 16 U.S.C. §§ 470 *et seq.*, which provided for the recognition of historic places and objects of state and local importance in addition to those of national significance. The 1966 Act expanded the scope of the National Register to include not only National Historic Landmarks and historic properties of the National Park System, but properties of state and local importance nominated by the states. For the first time in such legislation, allowance was made for the recognition of historic "districts" in addition to the previously recognized sites, buildings and objects. Further, the 1966 Act added "cultural" significance as a valid subject of federal protective measures. As part of this expanded concept of cultural and historical significance, the 1966 Act added architectural and archeological importance to social and political importance as worthy of recognition.

In summary, the 1935 Act restricted its scope to the few properties possessing truly national historical significance. The Secretary is empowered thereunder to acquire property on behalf of the United States and to designate as National Historic Landmarks those exceptional properties of national importance. The 1966 Act broadened the scope of federal historical preservation by recognizing properties of state and local importance and by adding "districts" and "cultural" values as subjects of federal protective measures. The 1966 Act did not authorize acquisition of such properties but, rather, provided for the listing on the National Register with the protection inherent in such listing.

Plaintiffs argue that designation of the District as a National Historic Landmark and acceptance of the Green Springs easements, though authorized actions under the 1935 Act, were accomplished by applying the standards of the 1966 Act. As a threshold matter, the Court finds that plaintiffs' contention that the District lacks national significance and is therefore not a proper subject of recognition under the 1935 Act is more appropriately an attack on the merits of the Secretary's decision rather than on his authority; the Court finds that the Secretary regarded the District's historic qualities as possessing national importance and did not misapply a state or local standard to the District. This attack on the merits will be addressed in a later section. However, plaintiffs do raise some apparent inconsistencies between the Secretary's actions under the 1935 Act and the language of that Act.

First, the Secretary appears to have based the findings of the District's histori-

cal significance on its architectural qualities, yet recognition of "architecture" and "cultural" values is only mentioned in the 1966 Act. Further, recognition of a historic "district", as opposed to sites, buildings and objects, is likewise mentioned only in the 1966 Act. Plaintiffs also argue that because the Green Springs easements do not grant any right of public access to the affected land, and because the Department has consistently disavowed any intention of publicizing the District, the acceptance of the easements does not constitute acquisition of property "for public use", the stated policy of the 1935 Act. A further violation of the underlying policy of the 1935 Act is alleged in the fact that the easements provide incomplete protection to the District and therefore their acquisition does not in fact "preserve" the historic property. Finally, plaintiffs argue that the Department's acceptance of the easements before approval of any appropriations for the undertaking violates the 1935 Act requirement that no property be acquired thereunder "which will obligate the general fund of the Treasury for the payment of such property, unless or until Congress has appropriated money which is available for that purpose." 16 U.S.C. § 462(d).[2]

■ The Court has little trouble with most of these allegations. That the easements do not grant a right of public access to the property is not violative of the policy of preserving historic properties "for public use," as that term may encompass the "taking of land for commemorative purposes." *Barnidge v. United States*, 101 F.2d 295, 298 (8th Cir. 1939). Nor is it a violation of the Act's policy that the preservation easements in many instances allow for subdivision and development of the land or cover less than half of the District. It is clear from the administrative record that the Department viewed acceptance of the easements as merely an initial step towards preservation of the District and not as a final protective

measure. The Court also finds that the acceptance of the easements did not "obligate the general fund of the Treasury *for the payment of such property*," (emphasis added) but simply entailed certain administrative costs for maintenance of the easements.

The Court admittedly is troubled, however, by the Department's assertion that a "district" the size of Manhattan can be a historic "site," in spite of the absence of any significant commemorative event or historical person associated with it, and further that its architectural significance is covered by the term "historic" in the 1935 Act. A review of the legislative history of the 1935 Act and the 1966 Act reveals that the latter was necessitated by the narrow scope of the 1935 Act. In light of that fact, it strikes the Court as incongruous that the scope of the 1935 Act's protection should be expanded here so far beyond a literal reading of the Act's language.

In construing the extent of the Secretary's authority under the 1935 Act, the Court's task is made the more difficult by the absence of adequate substantive criteria for that which merits treatment as a National Historic Landmark or what constitutes national historic significance for purposes of acquiring property. Further, while the Court finds it possible that the Secretary's actions were authorized under the 1935 Act, the paltry statement of reasons for the Secretary's actions forces the Court to speculate about how the Secretary applied the Act's standards to the District. Because these and other procedural problems, in the Court's view, require a reversal and remand to the Secretary, as hereinafter discussed, the Court will not engage in speculation concerning the scope of the Secretary's authority.

## IV. REVIEW OF SECRETARY'S FINDINGS AND CONCLUSIONS

As noted above, plaintiffs challenge the Secretary's decisions regarding the District

---

**2.** 16 U.S.C. § 462(d) includes the following proviso concerning the acquisition of property under the 1935 Act:

That no such property shall be acquired or contract or agreement for the acquisition

thereof made which will obligate the general fund of the Treasury for the payment of such property, unless or until Congress has appropriated money which is available for that purpose.

848

as being arbitrary, capricious, and violative of the Fifth and Tenth Amendments. The Court shall address these challenges in reverse order.

### A. Tenth Amendment

The Court finds no support in the record for plaintiffs' argument that the Department's designation of the District as a historic district constitutes federal impairment of essential state functions in violation of the Tenth Amendment.[3] The Supreme Court in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), emphasized the crucial distinction for Tenth Amendment purposes between federal regulation of wholly private activity and regulation "directed, not to private citizens, but to the States as States." Id. at 845, 96 S.Ct. at 2471, citing *Heart of Atlanta Motel v. United States*, 379 U.S. 241, 262, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). The former is a valid exercise of Congress' commerce power so long as the means used are "reasonably adapted to the end permitted by the Constitution." Id. at 840, 96 S.Ct. at 2469. The latter, however, is precluded by the Tenth Amendment where such action "force[s] directly upon the States [Congress'] choices as to how essential decisions regarding the conduct of integral governmental functions are to be made." Id. at 855, 96 S.Ct. at 2476.

The federal program, in the instant case, is not of the same type as that found violative of the Tenth Amendment in *Virginia Surface Mining & Reclamation Ass'n., Inc. v. Andrus*, 483 F.Supp. 425 (W.D.Va. 1980). In *Virginia Surface Mining*, the court found certain provisions of the Surface Mining Control and Reclamation Act of 1977 unconstitutional as it impaired Virginia's freedom to operate in "areas of traditional governmental functions." Id. at 435, *citing National League of Cities, supra* at 852, 96

S.Ct. at 2474. Specifically, the court found that the Act, which basically imposes environmental performance standards on coal surface mining operations, "forced relinquishment of state control of land use planning; . . . loss of state control of its economy; . . . economic harm, from the expenditure of state funds to implement the Act and from destruction of the taxing power of certain counties, cities, and towns." Id.

The regulatory scheme implemented under the 1935 Act in the instant case imposes no financial burden on the state for funding the landmarks program. The federal oversight of certain land development, triggered by the landmark designation, has not wrested control of land use from the state, nor has it visited such economic harm as to deprive Virginia of control of its economy. Plaintiffs have shown no significant interference with local zoning powers, notwithstanding their characterization of the program as federal zoning. Instead, as will be discussed more fully below, the effects of the Department's actions in the District are felt more severely by the property owners than by the State.

### B. Fifth Amendment

Although a closer question, plaintiffs' Fifth Amendment attack on the Secretary's actions concerning the District also fails to make out a valid claim. Plaintiffs contend that the Secretary's designation of the District as a historic landmark constitutes a taking for a public use "without just compensation" in violation of the Fifth Amendment.[4] Plaintiffs argue that the economic injuries to Green Springs landowners inherent in the Secretary's actions must be compensated by the government. While the Court acknowledges that the Department's actions subject Green Springs

---

**3.** The Tenth Amendment provides as follows:
The powers not delegated to the United States by the Constitution, nor prohibited by it to the state, are reserved to the states respectively, or to the people.
U.S.Const. Amend. X.

**4.** The Fifth Amendment provides, in pertinent part:
No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.
U.S.Const. Amend. V.

property to the purview of federal statutes which may restrict the future use of such property, such governmental action is not confiscatory in nature as to constitute a taking.

■ A determination of whether governmental actions affecting private property implicate the Taking Clause of the Fifth Amendment requires the Court to examine whether those actions "force some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960); *see PruneYard Shopping Center v. Robins*, —— U.S. ——, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 123–25, 98 S.Ct. 2646, 2659–60, 57 L.Ed.2d 631 (1978). Factors relevant to this inquiry include the character of the governmental action, its economic impact, and the degree of its interference with reasonable investment-backed expectations. *Id.* at 124, 98 S.Ct. at 2659; *see PruneYard Shopping Center, supra; Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

The government activity in the instant case, though intrusive, is not confiscatory. No title to Green Springs property has changed hands as a result of the Secretary's actions. Rather, the recognition of the District's landmark status triggers the application of several federal statutes which could impede or discourage commercial and industrial development in the area. Specifically, the District's listing on the National Register triggers inter–agency consultations pursuant to 16 U.S.C. § 470f, in the event of any federal or federally assisted undertakings in the area. Further, such listing entails the application of § 2124 of the Tax Reform Act of 1976, 26 U.S.C. § 280B, which denies a business deduction for expenditures for the destruction of any "certified historic structures" within the District. Designation of the District as a landmark triggers review under the Mining in the Parks Act, 16 U.S.C. §§ 1901 *et seq.*, of any surface mining activity in the District

which could have a harmful effect on the registered property. Such review could ultimately lead to an abatement of the mining operation by the federal government. Designation also makes the District a proper subject under the 1935 Act for acquisition by the federal government, including acquisition by eminent domain. 16 U.S.C. § 462(d).

The economic effects of these actions are several. A Louisa County businessman who testified at trial reported that the Department's activities had had a chilling effect on business development in that county. In particular, VVL's mining operation in the District was delayed nearly a year, as the Department sought to delay both VVL's financing and the issuance of necessary permits by the Virginia State Air Pollution Control Board. W. R. Grace Co., Inc. heeded the Department's request not to exercise its mining rights in the District. A steel company reportedly abandoned its plans to locate a mill in the District due to the controversy over the Department's recognition of the District.

Recent U. S. Supreme Court opinions, however, indicate that this degree of interference with land use does not constitute a taking without just compensation. In *Penn Central Transportation Co. v. New York City, supra*, the Supreme Court found no taking under the Fifth Amendment in the application of New York City's Landmarks Preservation Law to the city's Grand Central Terminal. The city had declared the terminal to be a landmark and, pursuant to the statute, blocked construction of a proposed high–rise office building above the terminal. The Supreme Court found that the New York City law neither interfered with existing uses of the terminal nor prohibited *all* construction above or around the terminal. Instead, the Court found that the law allowed for "reasonable beneficial use" of the property without unduly restricting opportunities for further construction. *Id.* at 138, 98 S.Ct. at 2666. The Court thus sustained the application of the law despite its denial to the property owners of the potential income to have been

generated by a fifty–five story office building. *See also, Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (75% diminution in value caused by zoning law held not to constitute a "taking"); *Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (87.5% diminution not a "taking"); *Rogin v. Bensalem Township*, 616 F.2d 680 (3rd Cir. 1980) (33.3% diminution not a "taking").

More recently, in *Agins v. City of Tiburon*, —— U.S. ——, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), the Supreme Court held that a municipal zoning ordinance restricting landowners' development of property to a limited number of single–family dwellings did not take the landowners' property without just compensation. The Supreme Court held that such a limitation on development neither prevented the best use of the land nor extinguished a fundamental attribute of ownership. —— U.S. at ——, ·100 S.Ct. at 2142.

In the instant case, the Secretary's recognition of the District's landmark status triggers administrative review of surface mining and federal or federally–assisted undertakings in the area. To date, no type of development or industry within the District has been prohibited. The District's landmark status may in the future result in restrictions on land use, particularly on vermiculite mining. However, at this time, plaintiffs simply cannot show that the federal intervention into the District has been of such magnitude, or that the economic injuries so severe, that the Fifth Amendment's Taking Clause is violated. If, in the future, plaintiffs can demonstrate that the recognition of landmark status has more severely restricted development in the District than the record now shows, then a viable claim for relief under the Taking Clause may be presented. *See Penn Central, supra*, at 138 n.36, 98 S.Ct. at 2666.

### C. *Arbitrary or Capricious*

Plaintiffs' chief attack on the merits of the Secretary's decisions is under the "arbitrary, capricious, [or] an abuse of discretion" standard of § 706(2)(A) of the Administrative Procedure Act (hereinafter "APA") as applied in *Citizens to Preserve Overton Park v. Volpe, supra*. Plaintiffs argue that the District has no historic value of national significance and that the Secretary's recognition of, and efforts towards preservation of such historic value are abuses of discretion under that standard.

Plaintiffs allege a total absence of historical events, persons, or structures of national importance associated with the District that could support the Secretary's findings and conclusions. They emphasize that the Department historian was able to find records of only a few Revolutionary War or Civil War skirmishes which took place in or near the District. One structure in the District was said to have been used briefly as a hospital during the Civil War. Some of the first of McCormick's reapers were said to have been used to harvest crops in the District–a slim basis indeed for the Secretary's conclusion.

Plaintiffs argue further that other factors apparently relied upon by the Department in addition to traditional historic values fail to explain or support the landmark designation of the entire District. The uniform soil type of District, which the Department perceived as a major factor contributing to the District's unbroken history of agrarian use, consists in fact of several soil types. The District's boundaries appear to be broader than either the underlying soil zone or the "visual unity" attributed to the District by Department officials. Finally, plaintiffs argue that the District's architectural significance in representing a rural community of the eighteenth and nineteenth centuries is of statewide importance at best, and, at worst, is merely a confusing array of contrasting architectural styles.

In reviewing the merits of the Secretary's decisions, the Court is required to consider whether the decisions were "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, supra* at 416, 91 S.Ct. at 824. As noted above, with regard to determining whether the Secretary acted within the

scope of his authority, the absence of any detailed statement of reasons or of clear formal standards concerning national historic significance hinders the Court in ensuring that relevant factors were accurately considered. *Cf. Human Resources Management, Inc. v. Weaver*, 442 F.Supp. 241, 249 (D.D.C. 1978). Without them, the conclusory findings of national historic importance and of the acceptability of the easements offer provide little insight into whether the Secretary's discretion was properly exercised. However, rather than require the Secretary to submit *post hoc* rationalizations for his decisions, the Court must remand the case for proper compliance with procedural due process, as is set out below, of which a statement of reasons and promulgation of substantive standards are merely two of several components.

## V. NECESSARY PROCEDURAL REQUIREMENTS

■ Plaintiff's primary attack on the Secretary's decisions concerning the District deals with alleged procedural inadequacies which, plaintiffs argue, contravene basic principles of due process and provisions of the APA and NEPA. Specifically, plaintiffs contend that the Due Process Clause of the Fifth Amendment requires the Secretary to promulgate both substantive and procedural regulations to guide the Department and the affected landowners in the process of landmark designation and easement acceptance. The Secretary's failure to develop such official guidelines, plus his alleged failure to state adequately reasons for his decisions, the purportedly inadequate notice to the public of the procedures being followed and actions being taken, and an alleged bias on the part of several Department officials, are cited as violative of plaintiffs' due process rights. Plaintiffs further argue that the Secretary's decisions concerning the District constitute rules under § 551 of the APA, 5 U.S.C. § 551(4), but

that the Department failed to follow the requisite procedures for rulemaking under the APA, 5 U.S.C. § 553. Finally, plaintiffs argue that the Department erred in not preparing an environmental impact statement pursuant to the NEPA, for each of the landmark designation, the acceptance of the Green Springs easements, the Department's overall plan for the District, and the proposed national easements acceptance program. With regard to this latter claim, however, the Court finds the Department's negative declarations of environmental impact reasonably concluded that environmental impact statements were unnecessary. *See Conservation Council of North Carolina v. Costanzo*, 398 F.Supp. 653 (E.D.N.C.), aff'd 528 F.2d 250 (4th Cir. 1975).[5]

■ Exactly what procedures are required in designating a property a National Historic Landmark and in acquiring property interests in such landmark is not clarified by the 1935 Act nor by the APA. The 1935 Act is silent concerning the methods for these exercises of the Secretary's discretion. The Court finds also that these decisions do not constitute rules under the APA and that therefore the Department is not bound by the Act's rulemaking requirements. Nor does the Department seem, in this instance, to be governed by the APA's requirements concerning adjudicative procedure, 5 U.S.C. §§ 554, 555, 556 and 557. Instead, this agency action, like that in *Citizens to Preserve Overton Park, supra*, falls through the cracks of the APA.

The Department's procedures and standards with regard to the landmark designation and easement acceptance seem to have developed as the decision-making process went along. From the outset of this controversy, there were no formal criteria published for qualification as a National Historic Landmark. A pamphlet entitled "The National Historic Landmarks Program," and another entitled "Part One of the Na-

---

**5.** The Court finds further that the Department was justified in treating the landmark designation and easements acceptance as separate actions for NEPA purposes, not requiring environmental impact statements. In addition, it was perfectly reasonable for the Department not to address the necessity for assessing the environmental impact of a national easements program as such proposal never materialized.

tional Park System Plan History," both published by the Department, contain a list of criteria for national significance purportedly employed by the Department's Advisory Board. The only criterion relevant to a district reads:

> 7. When preserved or restored as integral parts of the environment, historic buildings not sufficiently significant individually by reason of historic association or architectural merit to warrant recognition may collectively compose a "historic district" that is of historical significance to the nation in commemorating or illustrating a way of life in its developing culture.

The pamphlets follow this list of criteria with an explanation of the single quality necessary for all historic districts, sites, structures, or objects: "integrity". With regard to a historic district, "integrity is a composite quality derived from original workmanship, original location, and intangible elements of feeling and association inherent in an ensemble of historic buildings having visual architectural unity."

These pamphlets, according to the Department, also contain the procedures governing the Department's designation process. The procedures detailed therein consist of the preparation of a study report concerning a potential landmark, review by a consulting committee of experts, followed by Advisory Board review. The Advisory Board then submits its recommendations to the Secretary who makes the final decision.

With regard to the Green Springs decisions, the Department neglected to make reference to the pamphlets in any public notice and mentioned the criteria contained therein only in a September 20, 1977 Federal Register announcement nearly two months after the public hearing on the issue. Further, on reconsideration of the District's landmark qualifications, the Secretary failed to follow the procedures he now claims govern his actions, choosing instead to substitute a public hearing for review of the proposal by the Advisory Board. Because the Advisory Board had no input into the reconsideration process, there can be no assurance that the criteria quoted above, which are to govern *its* review and recommendations, were employed by the Secretary. The Secretary's final decision, consisting of a single conclusionary sentence confirming a finding of national historic significance by Department officials, suggests only that Department officials *may* have employed such criteria.

In the absence of statutorily mandated procedures, courts must often set the minimal procedural requirements for informal adjudications. The Court borrows the term "informal adjudication" from Professor Paul R. Verkuil to signify those "administrative decisions that are not governed by statutory procedures but which nevertheless affect an individual's rights, obligations, or opportunities." P. Verkuil, *A Study of Informal Adjudication Procedures*, 43 U.Chic. L.Rev. 739, fn.1. (1976). In so doing, Courts are not so naive or presumptuous as to believe that procedures alone will ensure rational decisions. The courts' role is not to require correct or rational decisions, as noted in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 65 L.Ed.2d 460 (1978), but "to preserve the integrity of the decision–making process." *Barnes Freight Line, Inc. v. I.C.C.*, 569 F.2d 912, 923 (5th Cir. 1978).

The guiding light, albeit a dim one at times, for discerning the procedural adequacy of informal adjudication is the Due Process Clause of the Fifth Amendment.[6] Due process is called into play in the instant case by the degree of interference with plaintiffs' property interests, specifically their right to the use and enjoyment of their property. While the Court found such interference of insufficient magnitude to constitute a taking under the Fifth Amendment the Secretary's actions do place substantial restrictions on plaintiffs' property interest so as to require satisfaction of procedural due process. As noted briefly above, the Secretary's designation of the

**6.** *See* Note 4, *supra.*

District as a National Historic Landmark triggers the application of several federal statutes, the effect of which is to discourage private and governmental development of the land. Recognition of landmark status targets the District, or any part thereof, for acquisition under the 1935 Act. While the Secretary has limited his acquisition thus far to the preservation easements, the plans for the District published by the Department do not appear to rule out further acquisition, which could include acquisition by eminent domain. *Barnidge v. United States, supra.* Also triggered by landmark designation is the Mining in the Parks Act, 16 U.S.C. § 1901, *et seq.*, which provides, in pertinent part, for review by the Secretary of the Interior of any surface mining activity which may irreparably damage or destroy any part of the District. 16 U.S.C. § 1908(a). The Secretary's report of the potential damage is to be submitted to the Advisory Council on Historic Preservation, which may then recommend to Congress such legislation as it feels is necessary to mitigate or abate such mining activity. 16 U.S.C. § 1908(b).

Because landmark designation results in listing on the National Register, 36 C.F.R. 60.2(d)(2), the protective measures inherent in such listing apply with full force to the District. Among those measures is § 2124 of the Tax Reform Act of 1976, which denies the taxpayer any deduction otherwise allowed for amounts expended for, or incurred in, the demolition of a "certified historic structure." 26 U.S.C. § 280B(a). Structures within a historic district such as Green Springs are all treated as certified historic structures unless the Secretary certifies them to the contrary. 26 U.S.C. § 280B(b).

Listing in the National Register also entails the application of § 470f of the 1966 Act, which provides in pertinent part:

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any state and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking.

16 U.S.C. § 470f (as amended). Regulations promulgated by the Advisory Council on Historic Preservation, 36 C.F.R. §§ 800.1–800.10, and case law interpreting the scope of the term "Federal or federally assisted undertaking," suggest a very broad reading. *See, e. g., Ely v. Velde,* 451 F.2d 1130 (4th Cir. 1971); *Thompson v. Fugate,* 347 F.Supp. 120 (E.D.Va. 1972). The Court takes judicial notice of the extent of federal involvement in private and public land development of any magnitude.

The Department attempts to minimize the effect of these statutes, characterizing their application as speculative. However, plaintiffs need not speculate about the Department's intentions to utilize the protective measures available to it after having experienced the Department's efforts at preventing vermiculite mining in the District, coupled with those aimed earlier at blocking construction of the state prison facility.

Two inter–related principles have developed in recent years out of the concept of due process in the field of administrative law. The first principle holds that, in certain instances, the risk of erroneous deprivation by administrative action of an important property or liberty interest warrants additional procedural safeguards in the decision–making process, generally some form of hearing. *See* K. Davis, *Administrative Law Treatise,* §§ 13:1–13:15 (2d ed. 1979). The Supreme Court has adopted a balancing approach to determine what additional procedures, if any, are required in individual cases, entailing a

weighing of the importance of the private interest against the government's interest in efficient decision–making. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–3, 47 L.Ed.2d 18 (1976). *See also, Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The second principle, still in its fledgeling stage, recognizes that "due process means that administrators must do what they can to structure and confine their discretionary powers through safeguards, standards, principles and rules." *City of Santa Clara v. Kleppe*, 418 F.Supp. 1243, 1261 (N.D.Cal. 1976), *aff'd in part and rev'd in part on other grounds sub nom. City of Santa Clara v. Andrus*, 572 F.2d 660 (9th Cir.), *cert. denied* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978). This principle employs no balancing approach but simply holds that due process requires some standards, both substantive and procedural, to control agency discretion. *See* K. Davis, *supra* at 7:26.

Plaintiffs have not challenged the *form* of procedural safeguards employed by the Department, although the Court agrees with plaintiffs that a public hearing and review by the Advisory Board ought to be used as successive and not alternative procedures. A landmark designation process involving preparation of a departmental study report, opportunity for public comment and public hearing, review by a consulting committee and Advisory Board, prior to the final decision by the Secretary, represents for the most part a proper balancing under the first principle referenced above of private and governmental interests in this administrative context. *Cf. Appalachian Power Co. v. Environmental Protection Agency*, 477 F.2d 495, 503 (4th Cir. 1973). Plaintiffs' chief due process argument, however, is that without published rules of procedure and substantive criteria for qualification as a landmark, they have been denied any meaningful opportunity for informal response to the proposed action and the Court has been precluded from meaningful review of the Secretary's decisions. The Court agrees.

Perhaps the most informative case in the development of the due process principle of required rulemaking for the establishment of agency standards is *Environmental Defense Fund v. Ruckelshaus*, 142 U.S.App. D.C. 74, 439 F.2d 584 (D.C. Cir. 1971). The U.S. Court of Appeals for the District of Columbia Circuit was reviewing an order of the Secretary of Agriculture refusing to suspend a registration of a pesticide, under a statute permitting such suspension "to prevent an imminent hazard to the public." The Court remanded the case to the agency due to the absence of any regulations relating to suspension and of any explanation of the decision. Discussing the role of judicial review of agency action, the Court held: "Judicial review must operate to ensure that the administrative process itself will confine and control the exercise of discretion. Courts should require administrative officers to articulate the standards and principles that govern their discretionary decisions in as much detail as possible." 439 F.2d at 598. On remand, the agency was required to formulate standards and state findings and reasons showing a proper application of those standards.

Such a fundamental principle, though only recently linked with due process, has been invoked in several administrative contexts. *Holmes v. New York City Housing Authority*, 398 F.2d 262 (2d Cir. 1968), involved a challenge to the City Housing Authority's procedures for admission of tenants to low–rent public housing projects. The plaintiffs complained that the Authority did not process the applications chronologically or in any other systematic manner, and further that when a determination of ineligibility was made, no notice or statement of reasons was given. In affirming a denial of the city's motion to dismiss, the court held that in light of the potential for abuse of uncontrolled agency discretion, "due process requires that selections among applicants be made in accordance with 'ascertainable standards'". *Id.* at 265, *citing Hornsby v. Allen*, 326 F.2d 605, 609–10 (5th Cir. 1964).

In *White v. Roughton*, 530 F.2d 750 (7th Cir. 1976), welfare recipients challenged the termination of their benefits under a general township assistance program. The court held that the administrator of the program, although not bound by any eligibility requirements other than those in the state general assistance statute, was still required "to administer the program to ensure the fair and consistent application of eligibility requirements." *Id.* at 754. Finding the administrator's use of personal unwritten standards for eligibility violative of due process, the court required him to "establish written standards and regulations." *See also Silva v. Secretary of Labor*, 518 F.2d 301, 311 (1st Cir. 1975); *United States v. Barbera*, 514 F.2d 294, 302–04 (2d Cir. 1975); *Mobil Oil Corp. v. Federal Power of Com.*, 157 U.S.App.D.C. 235, 483 F.2d 1238 (1973); *Soglin v. Kauffman*, 418 F.2d 163, 168 (7th Cir. 1968); *Baker–Chaput v. Cammett*, 406 F.Supp. 1134 (D.N.H.1976); *Smith v. Ladner*, 288 F.Supp. 66, 70–71 (S.D.Miss. 1968).

Although the Secretary in the instant case purports to have relied on the informal criteria contained in two agency publications, the Court finds that that does not satisfy due process for several reasons. First, the criteria contained in the two pamphlets are merely to be used by the Advisory Board, which can only make recommendations on a final decision by the Secretary. Second, the procedural guidelines contained in those publications were not treated as binding by the Secretary, as he chose to substitute a public hearing for the required Advisory Board review. If the procedures contained therein are optional, presumably the substantive criteria are as well. Third, the criteria referred to are so vague and open–ended that their use in the designation process provides no limitations on the Secretary's discretion. Fourth, the public affected by landmark designation, who in the Court's view were entitled to their public hearing, were not informed of these criteria until after the hearing.

In addition to regulations establishing substantive criteria, the Department is required to promulgate rules of procedure to govern its landmark designation process. The source of this requirement is shared by the Due Process Clause and § 552 of the APA, which requires each agency to publish in the Federal Register for the guidance of the public:

(B) statements of the general course and method by which its functions are channeled and determined . . . [and]

(C) rules of procedure . . . .

5 U.S.C. § 552(a)(1). This provision provides further that no person may be adversely affected by administrative action taken pursuant to unpublished procedures. *See W. G. Cosby Transfer & Storage Co. v. Froehlke*, 480 F.2d 498 (4th Cir. 1973).

Instructive of this aspect of due process in administrative law is Judge Gesell's well–reasoned opinion in *Northern California Power Agency v. Morton*, 396 F.Supp. 1187 (D.D.C.1975), *aff'd sub nom. Northern California Power Agency v. Kleepe*, 176 U.S.App.D.C. 241, 539 F.2d 243 (D.C. Cir. 1976). *Northern California Power* involved a challenge to the promulgation of rate increases by the Department of the Interior for electrical power sold to customers in California through a Department project. The procedures employed by the Department were not unlike those used in the instant case. Rather than promulgate and adhere to a formal code of procedural rules, the Department, through its Bureau of Reclamation developed informal procedures "on an ad hoc basis as the matter went along." 396 F.Supp. at 1189. The Department gathered and disclosed to its customers a substantial amount of information concerning the proposed increases. When a public hearing was held, as in the instant case, no questioning of Department officials was allowed and no response was made to points raised at the hearing. When the Assistant Secretary of the Interior announced the rate increases, the factors relied on and the underlying reasoning were not disclosed.

The court in *Northern California Power* held that the Department's procedures violated both the APA and due process. As in the instant case, the court found that there

were no procedural guidelines by which the electrical power customers could gauge their actions. Although the Department claimed that its "actual and timely notice" of the procedures to be followed exempted it from this APA provision,[7] the court held such procedures to be "incomplete, imprecise and inaccurate." The "timely" notice of rules of procedure referred to in the APA was held to contemplate "a reasonably complete code of procedures set out in advance by which action can be guided and strategies planned." 396 F.Supp. at 1191.

As in *Northern California Power*, the Department, in the instant case, relied on unpublished procedures for its landmark designation. The public information pamphlets published by the Department, and the June 29, 1977, Federal Register announcement of the substitution of a public hearing for Advisory Board review hardly suffice as a "reasonably complete code of procedures" by which plaintiffs could plan their strategy. The procedures were formulated on a similar ad hoc basis, involving deviation from the informal procedures and identification of the issues after the public hearing. The Department's easements acceptance suffered from the same procedural inadequacies. Procedures were announced in the Federal Register on May 18, 1977, at which time half of the procedures had been "accomplished". In addition, the statement of procedures was misleading in that the hearing held on the easements acceptance on April 22, 1977 was designated after the fact as a hearing in connection with an environmental assessment of the easement proposal, not simply a general hearing on the merits of the proposal.

Similarly, the court in *Northern California Power* found that the ad hoc procedures actually followed in that case fell short of the due process requirement that the agency "acquire the information it should have in a manner fairly calculated to illuminate the issues for reasoned decisionmaking." 396 F.Supp. at 1193. The court there found that in the context of rate–making, due process required that the basis for the proposed agency action be set out in sufficient detail to permit those affected to make a meaningful response. That opportunity for meaningful response was held denied by the "vague and shifting" procedures not fixed in advance, the non–disclosure of important information relied on by the Department, the fact that Department officials made recommendations to the Assistant Secretary but were unavailable for on–the–record questioning, and the absence of a detailed explanation of the reasons underlying the rate increases. 396 F.Supp. at 1194. The instant case, in the Court's view, is burdened by the same due process failings. The Department had no fixed procedures published in advance by which the Green Springs landowners could plan their response. Important information relied on by the Department was disclosed, if at all, in piecemeal fashion often after any opportunity for meaningful response had passed. Department officials made several off–the–record, undisclosed recommendations to the Secretary, but were unavailable for on–the–record questioning. Finally, the Secretary neglected to explain in sufficient detail the rationale underlying the designation decision.

## VI. CONCLUSION

The Court thus finds the landmark designation invalid based on the Department's failure to promulgate substantive standards for national historic significance and its failure to prepare and publish rules of procedure to govern the designation process.[8] The Court finds further that the administrative record provides an inadequate insight into the reasons underlying the landmark designation, including but not limited to the District's historic values of

---

7. 5 U.S.C. § 552(a)(1) provides that no person may be adversely affected by a matter required to be published in The Federal Register and not so published "[e]xcept to the extent that a person has actual and timely notice of the terms thereof."

8. Because the Court finds these procedural flaws fatal to the landmark designation, it is unnecessary to address plaintiffs' allegations concerning improper notice and bias.

national importance and the justification for drawing the boundaries as they now exist. As discussed above, the flaws in the Department's actions concerning the District are for the most part relevant only to the landmark designation. The Court finds that plaintiffs' due process rights are not implicated by the Department's acceptance of already–existing preservation easements over parts of the District. However, because the Secretary's powers of acquisition are contingent upon a property's landmark status, the easements acceptance is hereby invalidated irrespective of the procedural flaws associated with it.

The Court must, therefore, remand this matter to the Department for promulgation of both substantive and procedural regulations consistent with the Court's opinion. On remand, the Court urges the Secretary not simply to codify the criteria and procedures developed informally in the instant case, but to articulate meaningful standards in as much detail as possible so that the Department's efforts are channeled efficiently, the public may make a meaningful response, and, in the event further judicial review is necessary, a court may determine that the proper standards have been applied. In articulating substantive standards, the Department should be careful to develop criteria for landmark designation that are consistent with the language of the 1935 Act. With regard to the standards to be applied to historic districts, the Department should address the question of a district's inclusion under the term "site" and provide for the criteria relevant to setting the boundaries of such a site. To the extent that other comments of the Court have suggested additional clarification, the Secretary should respond thereto in the subsequent promulgation of regulations.

 In addition, the Secretary should ensure, by means of a clear statement of reasons, that the public and, if necessary, a reviewing court, can understand the grounds for his exercise of discretion. *See Matlovich v. Secretary of the Air Force,* 192 U.S.App.D.C. 243, 248, 591 F.2d 852, 857 (D.C. Cir. 1978); *Environmental Defense Fund v. Ruckelshaus, supra,* 142 U.S.App. D.C. at 86, 88, 439 F.2d at 596, 598. No formal findings need be articulated, but the Secretary should indicate in as much detail as possible the reasoning supporting his ultimate decision.

## ORDER

In accordance with the memorandum of the Court this day filed, and deeming it proper so to do, it is ADJUDGED and ORDERED that:

1. The designation of the Historic Green Springs District as a National Historic Landmark and its placement on the National Register of Historic Places be, and the same are hereby set aside as violative of plaintiffs' due process rights under the Fifth Amendment, U.S.Const. Amend. V, and of the Administrative Procedure Act, 5 U.S.C. § 552(a)(1);

2. The acceptance of the preservation easements over the District be, and the same is hereby set aside due to the defective landmark designation;

3. The Secretary shall remove the District from the National Register and any list of National Historic Landmarks; and

4. The Secretary shall develop and promulgate regulations setting out substantive criteria and procedural guidelines for landmark designation under The Historic Sites Act of 1935, 16 U.S.C §§ 461 *et seq.,* not inconsistent with the Court's memorandum.

The Court having found that counsel for the Secretary of the Interior has increased the costs unreasonably and vexatiously in connection with the interrogatories addressed to the defendants Andrus and Murtagh, it is ADJUDGED and ORDERED that said counsel pay unto Virginia Vermiculite, Ltd. the sum of Four Hundred and Eighty Dollars. ($480.00), representing excess costs incurred.

This action stands dismissed.