202 N.J. Super. 484 (1985)
495 A.2d 457
TOM DE VITIS, APPELLANT,
v.
NEW JERSEY RACING COMMISSION, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 29, 1985.
Decided July 15, 1985.
*488 Before Judges MICHELS, PETRELLA and BAIME.
Michael D. Schottland argued the cause for appellant (Chamlin, Schottland, Rosen, Cavanagh & Uliano, attorneys; Mr. Schottland, of counsel, Steven J. Abelson, on the brief).
Maxine H. Neuhauser, Deputy Attorney General argued the cause for respondent (Irwin I. Kimmelman, Attorney General of New Jersey, Attorney; James J. Ciancia, Assistant Attorney General, of counsel; Ms. Neuhauser, on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Tom De Vitis, a harness racing driver-trainer-owner licensed in New Jersey, appeals from a final administrative action of the New Jersey Racing Commission (Commission). The Commission imposed a 10-day suspension upon De Vitis for violating the provisions of N.J.A.C. 13:71-20.10(b). The Commission *489 found that during the fifth race at Freehold Raceway on November 1, 1983, De Vitis drove in an unsatisfactory manner as a result of lack of effort, carelessness, misjudgment or a demonstrated lack of judgment in performance in violation of the provisions of N.J.A.C. 13:17-20.10(b).
We have studied carefully the entire record in the light of the arguments presented and are satisfied that the determination of the Commission is not arbitrary, capricious or unreasonable and does not lack full support in the evidence. See Henry v. Rahway State Prison, 81 N.J. 571, 579-580 (1980); Campbell v. Dept. of Civil Service, 39 N.J. 556, 562 (1963). See also R. 2:11-3(e)(1)(D). Moreover, all of the issues of law raised are clearly without merit. R. 2:11-3(e)(1)(E).

I.
We emphasize that our role in reviewing the Commission's findings in a case of this kind is to determine "whether the findings made could reasonably have been reached on sufficient credible evidence present in the record, considering `the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility ... and ... with due regard also to the agency's expertise where such expertise is a pertinent factor." Mayflower Securities v. Bureau of Securities, 64 N.J. 85, 92-93 (1973), (quoting Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)). See also In re Suspension of Heller, 73 N.J. 292, 309 (1977); Jackson v. Concord Company, 54 N.J. 113, 117-118 (1969). We are satisfied that such evidence appears in the record.
Furthermore, it is not our function to substitute our independent judgment for that of an administrative body, such as the Commission, where there may exist a mere difference of opinion concerning the evidential persuasiveness of the relevant proofs. First Sav. & L. Assn. of E. Paterson v. Howell, 87 N.J. Super. 318, 321-322 (App.Div. 1965), certif. den., 49 N.J. 368 (1967). As a reviewing court, we will not weigh the evidence, *490 determine the credibility of witnesses, draw inferences and conclusions from the evidence, or resolve conflicts therein. See In re Tenure Hearing of Grossman, 127 N.J. Super. 13, 23 (App.Div. 1974), certif. den., 65 N.J. 292 (1974).
Additionally, the determination to be reviewed in this case is that of the Commission, not that of the administrative law judge who made findings of fact and conclusions of law. The supplementary legislation to our Administrative Procedure Act, see N.J.S.A. 52:14B-1 et seq.; 52:14F-1 et seq., has preserved the bifurcated administrative adjudication process in which the hearing and decisional phases of cases are handled separately. See In re Uniform Adm'v Procedure Rules, 90 N.J. 85, 91 (1982). Thus, while administrative law judges have primary responsibility for conducting hearings in contested cases, "the head of an agency will himself exercise the ultimate options of adopting, rejecting, or modifying" the recommendations of the administrative law judge in each particular case. Id. (quoting Sponsors' Statement to Senate No. 766 (Senators Yates and Weiss)). The Commission has the duty of ensuring that the administrative law judge's decision was based on a preponderance of the credible evidence. Cf. In re Polk License Revocation, 90 N.J. 550, 560 (1982); Dore v. Bedminster Tp. Bd. of Ed., 185 N.J. Super. 447, 453 (App.Div. 1982).
The Legislature vested in the Commission the power and duty to govern all aspects of horse racing in the State, including all those employed in the industry. State v. Dolce, 178 N.J. Super. 275, 285 (App.Div. 1981). The State has had and continues to have a vital interest in the horse racing industry, particularly since the business itself and the legalized gambling which accompanies its activities strongly impact the public interest. State v. Dolce, supra, 178 N.J. Super. at 284; State v. Garden State Racing Assn., 136 N.J.L. 173, 175-176 (E. & A. 1947). See Jersey Downs, Inc. v. Div. of N.J. Racing Commission, 102 N.J. Super. 451, 457 (App.Div. 1968). Indeed, the danger of clandestine and dishonest activity inherent in horse *491 racing, as in all forms of gambling, has been well recognized. See Garifine v. Monmouth Park Jockey Club, 29 N.J. 47, 55 (1959); Dare v. State, 159 N.J. Super. 533, 536 (App.Div. 1978). "Strict and close regulation is therefore regarded as highly appropriate," and the Commission's expertise in the area should receive substantial deference. Dare v. State, supra, 159 N.J. Super. at 537. See Jersey Downs, Inc. v. Div. of N.J. Racing Comm'n, supra, 102 N.J. Super. at 457.
Here, the Commission suspended De Vitis for unsatisfactory driving due to lack of effort in violation of N.J.A.C. 13:71-20.10(b). That provision states that:
(b) In the event a drive is unsatisfactory due to lack of effort, carelessness, misjudgment, or demonstrated lack of judgment in performance, and the judges believe that there is no fraud, gross carelessness, or a deliberate inconsistent drive, they may impose a penalty similarly under this subsection.
This rule is promulgated under authority of N.J.S.A. 5:5-30, which grants the Commission full power "to prescribe rules, regulations and conditions under which all races shall be conducted in the State of New Jersey...." See also N.J.S.A. 5:5-22.
Contrary to De Vitis's assertions, the Commission did not "blindly accept" the State Steward's and the Presiding Judge's testimony without considering De Vitis's explanation for his horse's divergent performances on November 1 and November 8. Where there is substantial evidence in the record to support more than one result, it is the agency's choice which governs. Dore v. Bedminster Tp. Bd. of Ed., supra, 185 N.J. Super. at 453. See New Jersey Bell Telephone Company v. State, 162 N.J. Super. 60, 76-77 (App.Div. 1978).
The Commission was fully entitled to reject the administrative law judge's report and to issue its own findings based on the record of the hearing below. See N.J.A.C. 1:16.4, 16.5. After fully "review[ing] the transcript of the Office of Administrative Law hearing and attempting to review the videotapes of the two races in question" (which videotapes were destroyed in the Freehold Raceway fire), the Commission *492 succinctly indicated its differences with the administrative law judge, including the following:
(f) Dunnville Pendy was a "commanding factor" in the November 8, 1983 race and demolished the field.
(g) During the November 1, 1983 race, Tom De Vitis did not get the most out of Dunnville Pendy, exhibiting a lack of effort. De Vitis should not have allowed himself to get locked in, especially when the horse had the ability exhibited on November 8, 1983. Having driven and trained the horse for at least three weeks prior to the November 1, 1983 race, De Vitis knew or should have known, the capacity of his horse. In making this finding the Commission finds State Steward Richard O'Donnell's testimony, which was based upon his 20 years experience as an official, credible.
Simply stated, "De Vitis did not get the most out of his horse on November 1, 1983." These conclusions had ample support in the record and should not be disturbed.
By focusing on whether De Vitis "knew or should have known ... the capacity of his horse" on November 1, 1983, the Commission set an exceedingly low threshold for identifying violations of N.J.A.C. 13:71-20.10(b) and placed a corresponding burden on its licensed drivers to avoid appearances of impropriety and to maintain the level and quality of competition in racing. Cf. Dare v. State, supra, 159 N.J. Super. at 536-537. N.J.A.C. 13:71-20.10(b) authorizes the Commission to penalize drivers for any "lack of effort, carelessness, misjudgment, or demonstrated lack of judgment in performance" without having to establish an element of fraud. In fact, in the instant case the Commission specifically excluded "from consideration all evidence and testimony relating to betting odds changes."
De Vitis also contends that the Commission's decision failed to adequately set forth the issues on which the Commission disagreed with the administrative law judge or the basis for that disagreement. However, the Commission "had no obligation to discuss in detail every point of disagreement with the ALJ." Public Advocate Dep't v. Public Utilities Bd., 189 N.J. Super. 491, 505 (App.Div. 1983). See New Jersey Bell Telephone Company v. State, supra, 162 N.J. Super. at 77. The Commission's decision needed only to "demonstrate that the agency gave attentive consideration to the ALJ's recommendation *493 as part of the record and [to] address itself to key items of evidence which were crucial to its decision." Public Advocate Dep't v. Public Utilities Bd., supra, 189 N.J. Super. at 506. See also St. Vincent's Hospital v. Finley, 154 N.J. Super. 24, 29-33 (App.Div. 1977).
An examination of the Commission's Final Decision establishes that it fully complied with these guidelines and that De Vitis's contention is therefore clearly without merit. The Commission specifically rejected the administrative law judge's consideration of the impact of "betting odds patterns" on De Vitis's conduct and carefully and succinctly outlined the key factors in the evidence underlying its conclusion that De Vitis had violated N.J.A.C. 13:71-20.10(b). In so doing, the Commission gave attentive consideration to the administrative law judge's recommendations and clearly indicated its area of disagreement with his opinion. The Commission thus fulfilled its duty as final arbiter in harness racing disputes. See N.J.S.A. 5:5-22 et seq.

II.
We are also thoroughly convinced that the destruction of the videotapes of the race did not preclude a determination of the charges by the Commission. The record reveals that sometime after the administrative hearing but before the Commission's consideration of this case a fire at Freehold Raceway destroyed the only copies of the videotapes of the November 1 and November 8 races. De Vitis argues that the consequent unavailability of those tapes should have precluded the Commission from reviewing the case because the tapes were "an essential element of the record on the facts herein."
As a threshold matter, it is well-established that an occupational license is in the nature of a property right, In re Polk License Revocation, supra, 90 N.J. at 562; see Lane Distributors, Inc. v. Tilton, 7 N.J. 349, 362 (1951); cf. Bechler v. Parsekian, 36 N.J. 242, 256 (1961), and that any deprivation *494 of that right is subject to the protections of due process. See Mathews v. Eldridge, 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976); Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); State in Interest of D.G.W., 70 N.J. 488, 502 (1976). Accordingly, any revocation or suspension of a harness racing driver's license must comply with the requirements of due process, Barry v. Barchi, 443 U.S. 55, 64, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365 (1979); see N.J.S.A. 52:14B-10, and the destruction of the videotapes must be viewed in terms of the impact of the unavailability of that evidence on De Vitis's right to procedural due process and a fair hearing. See State v. Serret, 198 N.J. Super. 21, 26 (App. Div. 1984); State v. Washington, 165 N.J. Super. 149, 155 (App. Div. 1979). See also California v. Trombetta, ___ U.S. ___, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); State v. Laganella, 144 N.J. Super. 268, 282 (App.Div. 1976), appeal dismissed, 74 N.J. 256 (1976).
To make that assessment, the reviewing court "must determine (1) whether there was bad faith or connivance on the part of the government and (2) whether defendant was prejudiced by the loss or destruction of the evidence." State v. Washington, supra, 165 N.J. Super. at 155. See California v. Trombetta, supra; U.S. v. Heiden, 508 F.2d 898, 902-903 (9th Cir.1974); State v. Serret, supra, 198 N.J. Super. at 26; State v. Kaye, 176 N.J. Super. 484, 490-492 (App.Div. 1980), certif. den., 87 N.J. 316 (1981). In the absence of a showing of bad faith by the State, case law suggests that charges may nonetheless be dismissed against a defendant upon a showing of manifest prejudice or harm arising from the destruction or loss of the evidence. See California v. Trombetta, supra, ___ U.S. ___, 104 S.Ct. 2528, 81 L.Ed.2d at 421-423; State v. Laganella, supra, 144 N.J. Super. at 282-283. Cf. State v. Carter, 91 N.J. 86, 110-112 (1982); State v. Washington, supra, 165 N.J. Super. at 154-158.
*495 In the instant case De Vitis makes no showing of bad faith on the part of the State relating to the videotape's destruction. It is therefore incumbent upon him to show that he suffered manifest prejudice or harm as a result of the permanent destruction of the tape warranting reversal of his suspension by the Commission. De Vitis primarily relies on the argument that without the videotape the Commission could not adequately fulfill its duty to review the record in the case because the administrative law judge's determination hinged on his viewing the videotape and a substantial portion of the transcript consisted of verbatim narration of the videotape by the witnesses. De Vitis also emphasizes that the decision by the track judges to suspend him was highly subjective and that without the videotape the record was lacking in objective evidence. He alleges that these factors placed an even higher duty on the Commission to review the record in its entirety and to dismiss the charges against De Vitis in the absence of the tape.
It is evident that "[w]henever potentially exculpatory evidence is permanently lost [or destroyed] courts face the treacherous task of divining the import of materials whose contents is [sic] unknown and, very often, disputed." California v. Trombetta, supra, ___ U.S. ___, 104 S.Ct. 2528, 81 L.Ed.2d at 421. In the circumstances of this case, however, it cannot be said that the destruction of the videotapes so prejudiced De Vitis as to warrant a reversal.
The facts in the case were substantially undisputed. Both parties agreed that in the November 1 race De Vitis became blocked in at approximately the half-mile post and that the only way he could have improved his position would have been to back up and circle the field. Also, neither party disputed that Dunnville Pendy trounced the field on November 8. Based on these undisputed facts, and De Vitis's own testimony describing Dunnville Pendy's training and background, the Commission concluded that De Vitis knew or should have known the capabilities of Dunnville Pendy on November 1. De Vitis should have *496 utilized this potential either to run a different race or to advance by circling the field.
Because the facts in the case were substantially undisputed the determination of the Commission hinged on its application of the unsatisfactory driving rule, not on its ability to view the tape. It should be noted that both Peter Virag, the Presiding Judge of Freehold Raceway, and De Vitis gave detailed descriptions of the race, albeit based on their observations of the videotape. Thus, the Commission did have grounds on which to reconstruct the events during the November 1 and November 8 races. In addition, De Vitis's primary defense, that he did not know Dunnville Pendy's potential on November 1 and that this lack of knowledge contributed to his being boxed in, was based entirely on his testifying to Dunnville Pendy's training schedule and was completely separate from his narration of the videotapes. De Vitis offers no grounds on which this court could conclude that the videotape was in any way exculpatory.

III.
Finally, De Vitis claims that the administrative law judge violated his right to due process by permitting Presiding Judge Virag and State Steward O'Donnell to testify at the administrative hearing. De Vitis argues that prior to the hearing the track officials had acted in a quasi-judicial capacity by ruling in the first instance on his suspension and that consequently the admission of their testimony injected the possibility of institutional bias into the determination of the administrative law judge and the Commission and was otherwise fundamentally unfair. We disagree.
We again emphasize that a harness racing driver's license constitutes a property right the revocation or suspension of which must comply with the requirements of due process. Barry v. Barchi, supra, 443 U.S. at 64, 99 S.Ct. at 2649, 61 L.Ed.2d at 375. See N.J.S.A. 52:14B-10; In re Polk *497 License Revocation, supra, 90 N.J. at 562; State in Interest of D.G.W., supra, 70 N.J. at 502. It accordingly is appropriate to consider De Vitis's challenge to the Commission's suspension procedure on due process grounds.
At the various stages of this case Virag and O'Donnell performed adjudicative and investigatory roles and then finally testified as witnesses at the administrative hearing. Virag initially served as presiding judge of the Freehold Board of Judges. The Board of Judges at a harness racing meeting has authority to "impose fines and penalties as prescribed by the Commission." See N.J.A.C. 13:71-8.21, 8.22. After investigating the races on November 1 and November 8 and conducting a de novo hearing at which De Vitis says he appeared, the Freehold Board of Judges ordered De Vitis's suspension. De Vitis then appealed that ruling to the State Steward in accordance with N.J.A.C. 13:71-3.8. The State Steward affirmed the Board of Judges' decision following a second de novo proceeding over which he presided. See N.J.A.C. 13:71-3.8. De Vitis thereafter appealed to the Commission, which referred the matter to the Office of Administrative Law as a contested case. At the ensuing administrative hearing Virag and O'Donnell testified as the Commission's only witnesses against De Vitis.
De Vitis objects to this merger of administrative functions by Virag and O'Donnell and claims prejudice arising therefrom. Generally, the rules of the Office of Administrative Law provide that "[e]xcept as otherwise provided by law or by administrative rule establishing a privilege ... [e]very person is qualified to be a witness" at an administrative hearing. N.J.A.C. 1:1-15.2(e). See N.J.A.C. 1:1-15.6. Two exceptions are contained within New Jersey's Administrative Procedure Act, which states that the "administrative law judge may in his discretion exclude any evidence if he finds that its probative value is substantially outweighed by the risk that its admission will either (i) necessitate undue consumption of time or (ii) create substantial danger of undue prejudice or confusion." N.J.S.A. 52:14B-10(a). Contrary to De Vitis's contentions, the *498 administrative law judge's decision to allow Virag and O'Donnell to testify in no way "affronted current notions of due process of law" nor in any way necessitated an undue consumption of time or created a substantial danger of undue prejudice or confusion.
Under New Jersey's former Constitution the former New Jersey Supreme Court held that a judge of the Court of Common Pleas who, acting in his capacity as a judge of the Court of Quarter Sessions, had presided over an earlier proceeding on an indictment, was not privileged from giving testimony in certiorari proceedings in the same matter before the Supreme Court. See State v. Donovan, 129 N.J.L. 478, 488-489 (Sup.Ct. 1943). More recently, New Jersey's courts have consistently upheld the merger of administrative functions in an agency or agency employees absent a showing of prejudice to the defendant. See In re Polk License Revocation, supra, 90 N.J. at 576-577 (1982); Matter of Cole, 194 N.J. Super. 237, 246 (App.Div. 1984); In re Trenton Bd. of Ed., 176 N.J. Super. 553, 565-566 (App.Div. 1980), aff'd, 86 N.J. 327 (1981); In re Blum, 109 N.J. Super. 125, 129 (App.Div. 1970); In re Larsen, 17 N.J. Super. 564, 569 (App.Div. 1952). Accord, Withrow v. Larkin, 421 U.S. 35, 56-57, 95 S.Ct. 1456, 1469, 43 L.Ed.2d 712 (1975). As the United States Supreme Court has commented, "[i]t is ... very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings and then to participate in the ensuing hearings. This mode of procedure does not violate the [federal] Administrative Procedure Act and it does not violate due process of law." Withrow v. Larkin, supra, 421 U.S. at 56, 95 S.Ct. at 1469, 43 L.Ed.2d at 729. These sentiments echo those of Kenneth Culp Davis in his treatise on administrative law, wherein he stated:
The Act does not and probably should not forbid the combination with judging of instituting proceedings, negotiating settlements, or testifying. What heads of agencies do in approving the institution of proceedings is much *499 like what judges do in ruling on demurrers or motions to dismiss. When the same examiner conducts a pre-hearing conference and then presides at the hearing, the harm, if any, is slight, and it probably goes more to impairment of effectiveness in mediation than to contamination of judging. If deciding officers may consult staff specialists who have not testified they should be allowed to consult those who have testified; the need here is not for protection against contamination but is assurance of appropriate opportunity to meet what is considered. [2 K. Davis, Administrative Law Treatise, § 13.11 at 249 (1958)].
De Vitis, relying on Unemployed-Employed Council of N.J., Inc. v. Horn, 85 N.J. 646 (1981), argues that permitting officials who have previously served in an adjudicative capacity in a case to testify in a later proceeding in the same case undermines the basic policy considerations behind the legislation which created the Office of Administrative Law. See L. 1978, c. 67; N.J.S.A. 52:14F-1. Justice Handler emphasizes in Unemployed-Employed Council of N.J., Inc. v. Horn that the legislation creating the Office of Administrative Law was intended as a direct response to the concern that the use by agencies of its employees "as hearing officers fostered an institutional bias or propensity in favor of the agency with respect to factfinding and recommended decisions that were felt to be unfair to the parties whose rights were being adjudicated." See Unemployed-Employed Council of N.J., Inc. v. Horn, supra, 85 N.J. at 650-651. Thus, the Legislature hoped "to bring impartiality and objectivity to agency hearings and ultimately to achieve higher levels of fairness in administrative adjudications." Id. at 650.
Contrary to De Vitis's contentions, though, the track officials' testimony in no way created a greater potential for institutional bias to impact the Commission's decision nor in any other way defeated the purposes of the legislation creating the Office of Administrative Law. The testimony of Virag and O'Donnell was highly probative of the circumstances surrounding De Vitis's offense and was fully consistent with the broad discretion granted to administrative factfinders to consider all evidence, including hearsay. See Weston v. State, 60 N.J. 36, 50-53 (1972). Moreover, the final rulings of both the Board of *500 Judges and the State Steward were already on the record and available for the Commission's review, whether or not the officials testified. Thus, their testimony did not inject an agency view or bias not already memorialized in the record of the case.
In our view the proceedings below fully complied with due process and afforded De Vitis a full and fair opportunity to present witnesses and evidence on his own behalf, to cross-examine the track officials and to rebut their testimony, and to present defenses on his own behalf, all before an objective factfinder in the Office of Administrative Law, not an employee of the Commission as forewarned by Justice Handler in Unemployed-Employed Council of N.J., Inc. v. Horn, supra. See In re Masiello, 25 N.J. 590, 600 (1958). As our Supreme Court emphasized in In re Polk License Revocation, supra, a "due process violation will be found only when a combination of functions is such as to render an independent judgment impossible." Id., 90 N.J. at 577. See Withrow v. Larkin, supra, 421 U.S. at 55-58, 95 S.Ct. at 1468-69, 43 L.Ed.2d at 728-730. De Vitis fails in the instant case to make any such showing. "[T]he bare assertion of improper conduct falls short of proof of actual bias, prejudice or violation of due process in a hearing required by our case law." See Matter of Cole, supra, 194 N.J. Super. at 246; In re Blum, supra, 109 N.J. Super. at 129.
In conjunction with his due process challenge De Vitis argues that because the Attorney General did not file any exceptions to the administrative law judge's initial recommendation to dismiss the disciplinary proceedings against De Vitis, the rules and regulations of the Office of Administrative Law barred him from filing his own comments with the Commission in support of affirmance. He claims that this procedural bar violated his right to due process and contributed to the unfairness of having Virag and O'Donnell testify as the sole witnesses for the State. De Vitis, however, misconstrues the extent of his due process rights under the Administrative Procedure Act. *501 Due process demands only that a litigant in a contested administrative adjudication receive a full and fair hearing conducted at the agency level. See Matter of Kallen, 92 N.J. 14 (1983). The fact that the only witnesses who testified for the State were Commission officials does not heighten the demands of due process. To accommodate the due process rights of litigants and to ensure that litigants have the opportunity to present their case before an objective factfinder, Unemployed-Employed Council of N.J., Inc. v. Horn, supra, 85 N.J. at 650-651, the Administrative Procedure Act provides generally for the hearing and decisional phases of administrative adjudications to be handled separately. Administrative law judges preside over hearings in contested cases, while the agency head retains the exclusive right to make final decisions upon review of the administrative law judge's recommendation. See N.J.S.A. 52:14B-10; In re Uniform Adm'v. Procedure Rules, 90 N.J. 85, 91 (1982).
As noted, De Vitis was fully accorded his right to an administrative hearing before an independent and objective factfinder. Following that hearing, the Office of Administrative Law's rules and regulations permitted him to file exceptions to the administrative law judge's decision and to respond to any exceptions filed by the State. See N.J.A.C. 1:1-16.4. But the regulations merely provide that litigants "may file exceptions." [Emphasis supplied]. Contrary to De Vitis's assertions, the Attorney General was under no compulsion to actively challenge the administrative law judge's opinion and could reasonably rely on the agency's review. Likewise, even though no exceptions were filed, the Commission was not bound by the administrative law judge's recommended decision but rather was free to accept, modify or reject it based on its own examination of the record and the arguments made by the parties before the administrative tribunal. See N.J.S.A. 52:14B-10; N.J.A.C. 1:1-16.4, 1-16.5.
Accordingly, the final administrative action of the Commission is affirmed substantially for the reasons expressed by *502 Chairman Goldsmith in his written opinion issued on August 16, 1984.