210 N.J. Super. 485 (1986)
510 A.2d 103
613 CORPORATION, 73 NORTH CORPORATION AND REVIEW TRADING COMPANY, PETITIONERS-APPELLANTS,
v.
STATE OF NEW JERSEY, DIVISION OF THE STATE LOTTERY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 28, 1986.
Decided May 30, 1986.
*488 Before Judges ANTELL, SHEBELL and MUIR.
Lewis H. Robertson argued the cause for appellants (Levy & Robertson, attorneys; Lewis H. Robertson, on the brief).
David Dembe, Deputy Attorney General, argued the cause for respondent (W. Cary Edwards, Attorney General, attorney; James J. Ciancia, Assistant Attorney General, of counsel; David Dembe, on the brief).
The majority opinion of the court was delivered by SHEBELL, J.A.D.
Petitioners-Appellants, three corporations operating adult bookstores, appeal from the Final Decision of the Acting Director *489 of the State Lottery Commission denying their requests to be licensed as lottery ticket agents.
On September 20, 1983, 613 Corporation, 73 North Corporation and Review Trading Company each made a written request for application for licensure. Review's previous application had been denied because of a sufficiency of existing agents in its area. By letter dated November 30, 1983, 613 Corporation and 73 North were informed by the Commission that they were ineligible due to a sufficiency of existing agents. On December 15, 1983, Review was informed that no further action would be taken on its previous denial. On January 10, 1984, counsel for all three applicants requested a hearing to determine the validity of the reasons posited by the Commission for the denials. The matter was transferred to the Office of Administrative Law.
The Administrative Law Judge issued an Initial Decision which affirmed the Lottery's decision. He found however, that the requests were denied solely because of the nature of the petitioners' businesses and that the Lottery had tentatively formulated a policy to deny applications on this ground. He discounted the Commission's contention that the denials were based solely on the ground of sufficiency of existing agents in proximity to each petitioner. He nevertheless upheld the denials, concluding that the Lottery could refuse to license adult bookstores and did not have to first promulgate rules in this instance to address what was in his view a relatively novel question.
The Commission filed exceptions to these findings, contending that sufficiency was the sole ground for the rejections and, although disclaimed as a basis in these cases, that it could refuse to grant licenses based on the nature of the enterprise. The Acting Director adopted these exceptions. He found proximity to have been the sole reason for the denials and accepted the determination that the Lottery could refuse to license based upon the nature of business conducted.
*490 Appellants contend that the Acting Director's final decision amounts to rulemaking in violation of the Administrative Procedure Act (APA) (N.J.S.A. 52:14B-1 et seq.), that the phrase "sufficiency of existing licenses" contained in N.J.S.A. 5:9-8(e) requires additional standards and that the denial of their application requests violated their constitutional rights.
We reverse and remand. The record will not support a finding that sufficiency was the sole reason for denial of these application requests. In addition, we disagree with the Acting Director's holding that rulemaking in accordance with the Administrative Procedure Act is not required. Our conclusions are based upon the full record, on which we now elaborate further.

I
The three appellants are situated in what Ms. Judith Berry, Lottery Deputy Director of Marketing, termed urban areas. Review and 73 North are located in Pennsauken; 613 Corporation in Mt. Ephraim. These adult bookstores are each on major thoroughfares.
Appellants' September, 1983, requests for applications were forwarded by Ms. Berry to Acting District Manager John Gray. On October 21, 1983 Gray submitted a memorandum to Berry informing her that he had spoken to Field Representative Tom Phelan concerning the applicants and noting Review's previous disapproval. His reference to petitioner's business therein stated
Each of the above locations are large x-rated book stores in our area.
Berry instructed Gray to personally visit the premises. This was unusual as Gray admittedly did not ordinarily make field investigations. He and Phelan visited each location on October 28, 1983. The District Manager photographed the exterior of each bookstore although this too was "not [a] standard procedure." He himself labelled it "highly unusual" and could recall doing so only once before in his 14 years with the Lottery. *491 That same day he signed agent disapproval forms for each petitioner and attached the photographs.
The forms instruct the investigator to "provide all marketing location data and a map covering your reasons for rejection." Gray drew no map for any location and gave the identical comment for each:
This is a large adult entertainment center  x-rated video movies with 18 girls on premises  Nude shows  p/o 3-store operation covered by different corporations with same corporate officer ...
On Review's disapproval he added:
Orig. disapproval dated 1/25/83  revisited area with S.F.R.T. Phelan on 10/28/83  no visible change in operation.
Review's original disapproval indicated the presence of one established agent within a one-quarter mile proximity. While Phelan stated that Review would not increase ticket sales because "anybody stopping here would be going in the store for specific purposes," he noted that Review averaged 5,000 customers per week. He remarked
This is the largest x rated book store in Camden County. While store is busy, they charge admission to the store. They appeal to a narrow band of general public. Most customers would have other items competing for impulse purchases ... (emphasis in the original)
Gray's function as District Manager was to gather marketing information and to make recommendations as to particular applicants. In making sufficiency recommendations he used such criteria as proximity to existing agents, sales records of those agents, the nature of a given "area," traffic flow, accessibility and parking availability. This, however, is done without written guidelines or empirical studies to provide structure to such evaluations. The lottery issued a single page guide to licensing and field procedure, but Gray had never seen it. The word "area" is not defined nor are there any set distance, demographic or marketing formulae applied in the process. Recommendations are made based upon a representative's subjective evaluation of the assigned territory. As Gray put it, agent approvals or disapprovals are basically "gut reactions" made on a case by case basis.
*492 Any information relevant to the grounds for a denial is to be included in the disapproval form. While it was customary to briefly state the nature of an applicant's business on the form, Gray felt it necessary in these cases to elaborate by including details as to the types of entertainment offered and by encircling the "x".
Also on the 28th, Gray received a call from John Marjarwitz, Deputy Director of Security for the Lottery. Marjarwitz's role in the process was to notify prospective applicants of the decision made by the Deputy Director of Marketing  Ms. Berry. He advised Gray to refer all further contact or information relating to petitioners directly to his office. The Deputy Director memorialized this call by writing "10/28/83  advised J.G. not to evaluate" on his copy of Gray's October 21 memorandum. The District Manager stated that this was unusual in that Marjarwitz had never previously made such a request.
Upon receiving these disapprovals, Ms. Berry telephoned Gray on November 3, 1983 and requested more information than the type of business conducted. She claimed to have been informed at that time of a sufficiency of agents in the areas of each bookstore. Although she denied the requests "as per above" referring to Gray's descriptions, she testified that the decision was based solely upon his sufficiency representations. Gray could recall no specific details of that conversation other than the Deputy's request for further information. Berry then submitted her disapprovals to Marjarwitz noting that she was
... having John Gray send county average and proximity maps to accompany these disapprovals.
Ms. Berry testified as the authoritative witness for the Lottery; hers was the final word on the application process. She has had no training or experience in wholesale or retail marketing. Like the District Office, she relied on no marketing-related studies or agency-promulgated standards in reaching her decision. She had no idea of the exact number of nearby agents, their sales averages or the municipal averages for each *493 application before her. She described sufficiency as a "wholly subjective determination."
At one point in the administrative proceedings, she admitted to making her decision based upon both Gray's unmemorialized representations and the nature of the businesses. However, at the second day of testimony, after having an opportunity to consult counsel, she retracted this admission and denied basing her "per above" rejections on any ground other than proximity. She stated the requested supplementation was to substantiate her prior denial and explained that proximity should be a representative's primary concern. "[I]n hindsight" she considered Gray's original omission of proximity data to be "odd" for a man as experienced as he.
On November 4, 1983 Gray submitted the supplemental disapprovals to Marjarwitz. Berry asserted she reviewed these forms although she did not sign them. Letters were then sent informing petitioners of their rejection.
At the hearing, Berry was questioned extensively on the hand-drawn maps submitted in the supplemental disapprovals. The map for Review indicated three liquor store-agents in some proximity. Review is located on the east bound side of Admiral Wilson Boulevard, a divided highway. One agent was a half-mile west on the same side. Another was located across the road. The third was on a side street which underpassed the Boulevard. There was no information provided as to traffic lights, signs or accessibility between the locations.
73 North is situated on Route 73, with two agents in proximity. One agent, one-quarter mile distant, was located on Route 130 north of its underpass with Route 73. The other agent was located one-eighth mile on the same side of the highway; however, it was contained inside an enclosed market. Again, no further traffic or access information could be discerned.
613 Corporation, on Black Horse Pike, is in proximity to five agents, ranging from one-quarter to three-quarters of a mile in *494 distance. Three agents were in different municipalities, and only one was located on the Pike, and then on the opposite side.
None of these maps detailed what structures were between the applicants and existing agents. The maps contained agent and municipal sales averages. However, Berry could not state what weight was given to these figures, which did "not go directly" to her determination. She acknowledged they had no independent significance unless accompanied by further data. She never explained how sales figures of other area agents factored in. While proximity is the prevailing factor, she noted that accessibility is important. Commenting on these maps she felt they were not as complete as they should have been.
Of 43 applications made during the same time period in petitioners' general area 38 were for new agents. Two were denied for security reasons and two for proximity. 34 were successful applications; of these 28 had three existing agents in some proximity, and five had at least five nearby. None were involved in the sale or showing of sexually explicit material.
Berry emphatically denied any policy to exclude from licensure enterprises such as those conducted by petitioners. However, she contended that if proximity were to be disallowed as grounds for their rejection, it would be within her prerogative to deny based on the nature of the business. Berry contended that the Lottery is itself a controversial enterprise subject to "moral" opposition. The Lottery considers adult bookstores controversial since they offend a segment of the populace and are constantly "in the headlines" and "before the courts." She asserted:
For us to offer for sale lottery tickets as an enterprise of the State of New Jersey benefitting education and institutions and establishments whose principle business it is to offer for sale or viewing sexually explicit materials would be simply of such controversy that it would not be in the best interest of the State of New Jersey, nor the Lottery.
The Deputy offered no evidence to show the deleterious effect licensing of adult bookstores would have on ticket sales. She concluded it was within the admittedly-subjective judgment of *495 the agency to have such a policy aimed at preventing potentially sensitive alignments. She did not view the liquor trade as controversial, despite objection to liquor sales from a segment of the population.
The parties stipulated to evidence of the earlier revocation of a license issued to one John Valentino. One of the reasons given therefor was his addition of sexually explicit material to his inventory. The Lottery determined that such would offend people and reflect upon the moral character of the agent and its own integrity.

II
Agency determinations will not be disturbed unless the findings could not have been reasonably reached on sufficient credible evidence considering the proofs as a whole, giving due regard to the agency's expertise where such is a relevant factor. Mayflower Securities v. Bureau of Securities, 64 N.J. 85, 92-93 (1973); Close v. Kordulak Bros., 44 N.J. 589, 599 (1965). The appellate tribunal must, however, make more than a perfunctory review; if there exists in the reviewing mind a definite conviction that the determination below went so wide of the mark that a mistake must have been made, the record can be appraised as if the matter were being decided at its inception. Mayflower Securities, 64 N.J. at 93; State v. Johnson, 42 N.J. 146, 161-162 (1964). This sense of "wrongness" arises in several ways, among which are the lack of inherently-credible supporting evidence, the obvious overlooking or underevaluation of crucial evidence or a clearly unjust result. 42 N.J. at 162.
The Director's determination overlooks the significance of both the documentary evidence and the contradictions in Ms. Berry's testimony as to the grounds for her decision. The sequence of events strongly suggests that the decisions to reject were finalized at a point in time when the only definite information before the agency pertained to the nature of each *496 applicant's business. The Director's conclusion that proximity was the sole basis for the denials was "wrong" in light of the substantial contrary evidence in the record. Id.
New Jersey Bell Tel. Co. v. State, 162 N.J. Super. 60 (App. Div. 1978) held that an agency may choose a result different from that of the factfinder so long as it is founded in the record. There, however, the determination under review was one particularly within the agency's expertise and statutorily-sanctioned discretion, and was appropriately accorded deference. Id. at 77. Here the Director's finding that proximity was the only ground for Berry's action was merely part of his general review and factfinding function. Expertise was not a "pertinent factor" in reaching that conclusion. Thus, no special deference need be afforded on that basis. See Mayflower Securities, supra, 64 N.J. at 93.
We conclude, as did the administrative law judge, that the rejections were not based solely on proximity. The fortuitous receipt of supplemental marketing data believed to support the denials enabled the Lottery to discard its original reasoning and thereby avoid expanding upon licensing criteria. The very best that can be said is that the disapprovals were based upon several grounds. The Director's approval of such duplicitous action constitutes an arbitrary, capricious and unreasonable application of his discretion and lacks fair support in the evidence. Campbell v. Dept. of Civil Service, 39 N.J. 556, 562 (1963); Henry v. Rahway State Prison, 81 N.J. 571, 579-580 (1980).
In reaching the above conclusion, we have addressed only the validity of the Director's determination as to the reasons for the rejections. We note the Lottery's contention that it could within its prerogative deny an application on the basis of the nature of a particular enterprise. We withhold any views on the ultimate ability of the Commission to so decide under appropriate circumstances.

*497 III

A.
Since we are convinced that the nature of the businesses involved constituted in part, if not in entirety, the basis for these disapprovals, there arises the question of whether the Lottery may take such action without first promulgating rules in accordance with the Administrative Procedure Act. It appears likely that a policy of denying licenses to what the Lottery deems "controversial enterprises" has been established, as evidenced by Ms. Berry's defense of her authority to refuse licensure on such grounds. The Administrative Law Judge and the Director appear to have concluded that rulemaking was not required in this instance. We disagree.
We are not bound by an agency's interpretation of a statute or determination of a strictly legal issue. Mayflower Securities, supra, 64 N.J. at 93. We are free to review the legal basis for the Director's decision. In determining if rulemaking is required, the threshold consideration is whether the enabling statute is itself sufficiently detailed to obviate the need for further regulation. See Airwork Ser. Div., etc. v. Director, Div. of Taxation, 97 N.J. 290, 293, 296 (1984); Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 329 (1984); R.H. Macy & Co., Inc. v. Director, Div. of Taxation, 77 N.J. Super. 155, 180 (App.Div. 1962), aff'd 41 N.J. 3 (1963).
In pertinent part, N.J.S.A. 5:9-8e authorizes the Director:
In accordance with the provisions of this act and the rules and regulations of the commission, to license as agents to sell lottery tickets such persons as in his opinion will best serve the public convenience and promote the sale of tickets or shares.
N.J.S.A. 5:9-11 further provides:
Before issuing such license the director shall consider such factors as (a) the financial responsibility and security of the person and his business or activity, (b) the accessibility of his place of business or activity to the public, (c) the sufficiency of existing licenses to serve the public convenience, and (d) the volume of expected sales.
*498 The Lottery Regulations add a fifth criterion: the moral character of an applicant or agent as it affects the integrity of the Commission. See N.J.A.C. 17:20-4.2; N.J.A.C. 17:20-5.1. Nowhere is there provided a standard by which the type of business conducted by an applicant may be considered as a ground for disapproval. The action before us must be evaluated in light of the principles governing the agency's choice of lawmaking procedure.
An administrative rule is defined as an "agency statement of general applicability and continuing effect that implements or interprets law or policy ..." N.J.S.A. 52:14B-2(e). If an agency determination constitutes an "administrative rule" it must comply with the procedural requirements of the Administrative Procedure Act to be valid. Airwork, supra, 97 N.J. at 300; Metromedia, supra, 97 N.J. at 338. Administrative agencies ordinarily enjoy discretion in choosing the procedures most suitable to their regulatory aims. Bally Mfg. Corp. v. New Jersey Casino Control Comm'n, 85 N.J. 325, 338 (1982) (Handler, J., concurring). However, this discretion is not without limits. Crema v. New Jersey Dept. of Environmental Protection, 94 N.J. 286, 299 (1983); See N.J.S.A. 52:14B-2(b), (c), (e). When an administrative agency has been delegated full rulemaking power it must bottom an alleged violation on general legislation before it can rule. The general mandate, either statutory or administrative, must precede the specific violation. Boller Beverages, Inc. v. Davis, 38 N.J. 138, 155 (1962).
The hallmark of an administrative rule is its general applicability, continuing effect and prospectivity. Metromedia, supra, 97 N.J. at 329; see Shapiro, "The Choice of Rulemaking or Adjudication in the Development of Administrative Policy," 78 Harv.L.Rev. 921, 929-42 (1965). A determination with the foregoing characteristics may also be considered an administrative rule when it is not "expressly authorized or obviously inferable" from the language of the enabling statute. 97 N.J. at 329; see Crema, supra, 94 N.J. at 301. Further, where the subject matter of a quasi-judicial adjudication encompasses *499 concerns that transcend those of individual litigants and implicates matters of administrative policy, rulemaking procedures should be followed. 97 N.J. at 331; see Texter v. Dept. of Human Services, 88 N.J. 376, 386 (1982). These procedural requirements ensure fairness by providing public notice, an opportunity for all interested parties to be heard, full factual development and the opportunity for continuing comment on the proposed action before a final determination is made. 97 N.J. at 331; see N.J.S.A. 52:14B-4.
In certain situations an agency may rely on adjudication to respond to specialized or unforeseen problems which may arise on a case-by-case basis; to rigidify the system by requiring rulemaking in every instance would impede an agency's statutory function. See Securities and Exchange Comm'n v. Chenery Corp., 332 U.S. 194, 201-203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995, 2002 (1947). However, the Supreme Court prefaced its conclusion by noting that because administrative agencies, unlike the courts, have the ability to make law prospectively through rulemaking, they have less reason to rely upon adjudication to formulate new standards; rulemaking should be relied upon wherever possible. Id.
Where rulemaking is clearly indicated, the need to follow statutorily mandated procedure will be obviated only when the agency is faced with unpredictable developments in which it has not acquired sufficient experience to resolve the matter by rule promulgation. Accord Metromedia, supra, 97 N.J. at 336-337; Boller Beverages, Inc., supra, 38 N.J. at 151-152. This alternative to rulemaking does not permit the unguided use of discretion to make a determination which would not be used to establish precedent. See K. Davis, Administrative Law Treatise, § 7:26 at 128 (2d ed. 1979).
The record suggests that the Lottery had applied the policy of denying licenses to businesses selling sexually explicit materials on at least one prior occasion in early 1983. The situation posed by petitioners' applications in the Fall of that *500 year therefore cannot be considered unpredictable or unforeseen. Inexperience in such matters appears unavailable to justify the failure to promulgate rules in light of the Lottery's being in operation for many years.
The Commission's assertion that it can disapprove applications on controversial nature of business grounds purports to bespeak a reasoned assessment of the authority with which it has been vested by the Legislature in light of the situation presented. Otherwise, it could not have advanced the changed nature of an agent's business as a reason for revocation in the earlier action. The absence of established standards either by statute or regulation governing this policy makes it impossible to ascertain the impact of its adoption. The Commission's action is of so indefinite a nature that it is impossible to "foretell what inferences may be drawn" from its application when future cases raise the same issue. Crema, supra, 94 N.J. at 303.
Finally, there is nothing in N.J.S.A. 5:9-1 et seq. or the resulting regulations from which this policy may be inferred or derived. N.J.A.C. 17:20-5.1 permits denials where the integrity or best interests of the Lottery are jeopardized by the actions of an agent which affect moral character. Premising this new criterion on this provision would be impermissible where no evidence has been adduced to indicate how the sale of sexually explicit materials reflects upon the morality of the seller.
There is an absence of any factor which could justify reliance on the adjudicatory mode of regulation. We conclude that the Lottery's reliance on adjudication amounted to an abuse of discretion in violation of the Administrative Procedure Act. Its action should be considered invalid. See Crema, supra, 94 N.J. at 301-303.

B.
We find no justification for the Lottery's unfettered exercise of discretion relative to sufficiency determinations. In its sixteen *501 years of existence, the Commission has operated under guidelines which are no more specific than the general enablement. The licensing regulations, with the exception of N.J.A.C. 17:20-5.1, essentially mirror the language of the statute. The agency has reserved for itself extremely broad parameters within which to decide who shall be licensed. The unabashed admissions of Gray and Berry make it apparent that this unbridled discretion exists even on the field level of operations. Sufficiency recommendations of a field representative, based upon gut reaction and subjective familiarity with the assigned area, are generally followed by the Deputy Director.
We recognize this is occasioned by the broadly-framed wording of N.J.S.A. 5:9-1 et seq. and the need for flexibility in this rather unique endeavor by our state government. The Lottery was established by the people of this state, by their approval of the amendment to Article IV, Section VII, paragraph 2 of the Constitution, in order to raise revenue. See N.J.S.A. 5:9-7a.
Broad discretion is called for so that the Commission may address the vagaries of the business and marketing world. However, it does not follow that because the Director has broad statutory discretion that the manner in which this discretion is exercised is not governed by standards that determine whether rulemaking must be followed in sufficiency assessments. Metromedia, supra, 97 N.J. at 333. Administrative officers should articulate the standards and principles that govern their discretionary acts in as much detail as possible. Crema, supra, 94 N.J. at 301; Environmental Defense Fund, Inc. v. Ruckelshaus, 439 F.2d 584, 598 (D.C. Cir.1971). Agencies must structure and confine their discretionary powers through procedural and substantive safeguards, standards, principles and rules. 94 N.J. at 301 (quoting Historic Green Springs, Inc. v. Bergland, 497 F. Supp. 839, 854 (E.D.Va. 1980)). Courts should review administrative exercises of discretion to ensure compliance with these requirements. Ruckelshaus, 439 F.2d at 598. Thus, we must insist upon the formulation of standards and a statement *502 of findings and reasons showing how the standards have been applied. Id.; see Davis, supra, § 7:26 at 130.
The record here is fraught with indicia of subjectivity. The testifying officials allegedly relied upon multiple factors in reaching conclusions as to sufficiency; however, they were unable to even approximate a formula delineating the relative weight given to each factor. In some instances a particular factor would have no bearing in the determination; in others, that same factor would be the conclusive element. The only procedural guidelines were in a one-page document which the District Manager had not even seen. It was admitted that the decision boiled down to the investigator's "gut reaction" based upon asserted subjective knowledge of a given area.
Conceivably the process varies from district office to district office and field representative to field representative. The Lottery's contention that the diversity of our state requires regional variance may have merit. However, guidelines pertaining even generally to characteristics of the regions could have been developed in the Lottery's sixteen years of experience. The absence of published standards to ensure fair and consistent application of eligibility requirements has resulted in a procedure which vests unfettered discretion in the Director and his staff in violation of the principles which structure such discretionary actions. White v. Roughton, 530 F.2d 750, 753-754 (7th Cir.1976). The promulgation of rules is of particular value in such summary decisions as those presented here. Dixon v. Love, 431 U.S. 105, 115 n. 12, 97 S.Ct. 1723, 1729 n. 12, 52 L.Ed.2d 172, 182 n. 12 (1977) (summary revocation of driver's license by State agency upheld where secretary defined statutory standard narrowly through promulgation of rules).
As noted by the Administrative Law Judge, the phrase "sufficiency of existing licenses to serve the public convenience" contained in N.J.S.A. 5:9-11 is merely a conclusion. Even though the dictionary definition of the word "sufficiency" may be beyond dispute, what is before us today are the procedures *503 used in reaching the sufficiency conclusion. Those methods and procedures are what the Legislature left to the Director's discretion. That this discretion is necessarily broad does not excuse the failure to enunciate standards by which it shall be fairly and consistently applied in each case.
The most disturbing aspect of the unbridled discretion in sufficiency determinations is that the affected public cannot fairly anticipate or address the procedure as there is no specific provision in the statute or regulations which describe the determination process. The public and interested parties are without any firm knowledge of the factors that the agency would deem relevant and influential in its ultimate decision. The public has been afforded no meaningful opportunity to shape these criteria which affect their interests. Crema, supra, 94 N.J. at 302. Nor is this omission remedied by notice of the proposed action, be it public or otherwise. See id., n. 12; Bergland, supra, 497 F. Supp. at 854; Boller Beverages, supra, 38 N.J. at 151-152. The lack of definite standards creates confusing results; no one has any way of predicting the inferences that can be drawn from the Commission's actions in future application denials. See 94 N.J. at 303. There can be no public confidence in a system that awards licenses based only on an individual's "gut reaction" or subjective impressions. Such a system breeds suspicion and fosters contempt and corruption.
Even accepting the Lottery's position that the nature of the businesses involved played no part in the rejections, the record demonstrates the inconsistency of the Commission's unstructured approach in sufficiency evaluations. The marketing data offers no objectively greater justification for the denials than that submitted for the 34 successful applications during the same time period. Although accessibility is a consideration mandated by the statute, the maps give no indication of the degree of access between petitioners' locations and those of nearby agents. Licenses were approved for applicants in areas in which as many or more agents existed. The below-average sales figures for neighboring locations are only one factor in *504 the nebulous or non-existent sufficiency formula, and the significance of those figures appears questionable. With its 5,000 customer weekly trade, Review might well have been able to sustain a strong level of ticket sales, something which would further the revenue goal of the Lottery. The bottom line is that the operative reasons for the sufficiency rejection in each case are not clear.

IV
Petitioners claim that their constitutional right to procedural due process has been violated by the absence of adequate standards governing sufficiency determinations. We disagree with this contention. We perceive no constitutional violation as there is no entitlement to or protected property interest in a ticket agent license. See Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2714, 33 L.Ed.2d 548, 561 (1972).

CONCLUSION
Approval of the vague, unpublished sufficiency standards which purport to sustain the disapprovals in petitioners' cases constitutes an abuse of the Director's discretion. Crema, supra, 94 N.J. at 303. The proximity grounds asserted for the denials lead to speculation as to what differentiated petitioners from other applicants; a result which cannot be tolerated.
The sufficiency rationale tendered for these disapprovals was merely a convenient label for the Lottery's refusal to license businesses engaged in what it feels are controversial activities. Whether the Lottery could deny licenses to such enterprises is a question we need not reach today as the Commission has not legislated to cover the situation presented. That question can only be reviewed after proper rules have been adopted.
The Final Decision of the Division of the State Lottery is reversed. The matters are remanded to afford the Commission the opportunity to shape the criteria upon which proper determinations on appellants' requests can be made.
*505 MUIR, J.S.C. (temporarily assigned), dissenting:
I respectfully dissent.
I do so on two grounds. First, the majority exceeds the carefully circumscribed role of an appellate court in reviewing the decision of an administrative agency. It weighs and sifts the evidence and achieves a conclusion bottomed on the premise of a "sense of wrongness." In doing so, it disregards sufficient credible evidence in the record to support the Acting Director's decision that petitioners' license applications were denied on the legislatively prescribed standard of sufficient existing licenses in the area to serve the public convenience.
Second, the Acting Director correctly determined that licensing of agents to sell lottery ticket should be in accordance with the adjudicatory rather than the rule-making process, given the precision of the legislative authority delegated to the Director to determine the sufficiency of existing licenses to serve the public convenience.

I.
The three September 20, 1983 applications were forwarded to Judith Berry. Ms. Berry, newly appointed to the position of Marketing Director for the Commission, ordered new field visits for the three sites. She ordered those visits despite the fact the Commission had denied an earlier application by Review Trading Company on the ground of sufficient existing licenses.
Even with reports recommending denial of the applications from a field representative and the District Manager, she sought additional data. Specifically, she asked for a map showing the location of existing licensed agents in the area of each applicant, average weekly gross revenues for each of those agents, and the ten-week gross revenue averages of agents in the area of the applicants' premises.
When Ms. Berry received the data requested, she concluded there were sufficient licensed agents in the area of each applicant. She then advised Deputy Director John T. Majarowitz of *506 her conclusion. Prior to her advising Majarowitz, she forwarded forms recommending rejection of the applications based upon the District Manager's representations as to sufficiency of existing agents. Her premature transmittal of those forms may be as attributable to her inexperience on the job as it could be to the majority's conclusion that the "sequence of events strongly suggests that the decisions to reject were finalized ... when the only definite information ... pertained to the nature of each applicant's business."
The maps, which consisted of area diagrams, showed the location of existing agents, their distance from applicants' sites, their gross revenues, and the ten-week average gross revenue for the existing agents in the municipalities involved.
The Acting Director, in making the determination that each of the denials was supported by substantial credible evidence in the record, specifically found:
(1) As to Review Trading:
Admiral Liquors is an existing agent located 500 yards west of Review on Admiral Wilson Boulevard; although the road is a divided highway, both sites are on the southerly or eastbound side; in addition, Exhibit J-24 shows two other agents in close proximity to Review, one of which (Stop'N Shop Liquors) is located across from Admiral Liquors and almost directly across from Review. Stop'N Shop Liquors was a new machine agent having recently been converted from a manual agent as of late 1983.
(2) As to 73 North Corporation:
There are two existing agents (Scott's Smoke in the Pennsauken Mart and the Stationery Store in Cinnaminson) within 1/4 mile of 73 North, one of which (Scott's Smoke) is on the same side of Route 73 only 1/8 mile away.
(3) As to 613 Corporation:
There are three agents (Bellmawr Liquors, DiPaul & Cifelli, and Rog's Deli) within 1/2 mile of 613; Bellmawr Liquors is located on the same side of Black Horse Pike, and Rog's Deli is on the opposite side; DiPaul & Cifelli is located on the nearest cross street, 1/4 mile away.
And (4) as to the average sales data:
Weekly sales figures were provided for each agent, based on a ten week average taken from the Lottery's computerized sales records; average weekly sales figures for each involved municipality were also provided; none of the agent's [sic] figures is so divergent from a community average as to indicate a need for more agents based solely on revenue; sales figures are part of the `mix' of data leading to a determination of `sufficiency'; however, they are not *507 assigned a fixed weight or role in the calculus of arriving at such determinations.
During the course of Berry's testimony before the Administrative Law Judge, the following colloquy occurred on petitioner's direct examination:
Q. Was proximity [of other licensed agents] the reason and only reason that the request for an application made by 613 Corporation was denied?
A. That's correct.
Q. Was the same true for 73 North Corporation and Review Trading Corporation?
A. Yes, it is.
And on redirect:
Q. In issuing these three denials was there any reason other than those that you have testified to which entered into your determinations?
A. No. The only information I had in front of me was the three maps.
* * * * * * * *
Q. Has anyone at the Division of the State Lottery ever suggested to you that you issue these denials for reasons other than those which you have testified to?
A. No, they have not.
Berry testified that she relied upon factors such as population density, the character of a given area, the nature of surrounding businesses and their ticket sales figures in making her determinations for licensing although she would not assign a specific weight to any one of the factors.
She also testified there was a 3500 maximum on the total number of license agents allowable. This limitation played a part in every determination whether to issue a license.
The Acting Director emphasized in his determination he "totally support[ed]" the testimony of Berry regarding her actions and reasoning.

II.
There is no disagreement that the appropriate standard of review to be applied by an appellate court reviewing the final decision of an administrative agency is for the court to examine the record to determine whether sufficient credible evidence *508 exists therein to support the agency decision. Mayflower Securities v. Bureau of Securities, 64 N.J. 85, 92-93 (1973), quoting Close v. Kordulak Bros., 44 N.J. 589, 599 (1965).
I disagree with the majority where, in its reaction to the "sense of wrongness," it weighs and sifts the evidence, disregarding well-established tenets regarding our appellate reviewing function.
It is not our function to substitute our judgment for that of an administrative agency where there may exist a difference of opinion concerning the evidential persuasiveness of relevant proofs. DeVitis v. New Jersey Racing Com'n., 202 N.J. Super. 484 (App.Div. 1985). As noted by Judge Michels in DeVitis, a reviewing appellate court
... will not weigh the evidence, determine the credibility of witnesses, draw inferences and conclusions from the evidence or resolve conflicts therein. [202 N.J. Super. at 489-490].
Furthermore, as Judge Matthews stated in Dore v. Bedminster Tp. Bd. of Ed., 185 N.J. Super. 447 (App.Div. 1982):
[S]hould there be substantial evidence in the record to support more than one result, it is the agency's choice which governs. [185 N.J. Super. at 453].
The majority not only weighs the evidence and determines credibility, it also draws inferences and conclusions from the evidence. It disregards the fact that there is sufficient credible evidence in Berry's testimony to support the Acting Director's determination that the applications were denied on proximity grounds alone. Even assuming there is substantial credible evidence in the record to support the majority's alternative conclusion that "the rejections were not based solely on proximity," an appellate court is not free to disregard the Acting Director's choice when it is based on sufficient credible evidence as well.
Part of the authority of the Director in making his determination is the weighing and sifting of the evidence. An integral element of that function necessarily must include a review of the transcript and the right to disregard answers where the questions propounded are of an overbearing or leading nature. *509 The majority overlooks, in its emphasis on Berry's "gut reaction" response, that petitioner's counsel extracted that response from the inexperienced Berry by asking her a significantly leading question, which led her to respond affirmatively to counsel's characterization of the sufficiency determination as a "gut reaction." That the Director was unpersuaded by that characterization is understandable.
Furthermore, we are required to give due regard to the expertise of the agency where it is pertinent. Mayflower Securities v. Bureau of Securities, supra, 64 N.J. at 93. An administrative agency is "presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings with that field carry the authority of an expertness which courts do not possess and therefore must respect." Freud v. Davis, 64 N.J. Super. 242, 246 (App.Div. 1960). The expertise of the agency is not that of one or two employees. Rather, it is the expertise of the agency as a whole. It is embodied in the decisions of the Commission or the Director of the Commission. Even when an ALJ decision is contrary to an agency head's determination, it is the expertise of the latter to which due regard must be given and which must prevail on review. In re Kallen, 92 N.J. 14, 20 (1983).
Here, the majority disregards these principles of appellate review by concluding that the Acting Director's finding of proximity of existing licenses as the only ground for denial of the applications was merely part of a general review and factfinding function.
The majority's conclusion misapprehends the essence of the expertise concept. Determining the sufficiency of licensed agents in a particular locale requires a specialized field of knowledge. There has to be an evaluation of the market potential for lottery ticket sales; potential that is unique in its nature. The analysis of that potential must rest with the Director and not with the courts on a substituted judgment basis.

*510 III
Administrative agencies have the choice, with extremely broad discretion, to implement the powers delegated to them by either rule making or adjudication. Texter v. Human Services Dep't, 88 N.J. 376, 383 (1982); Bally Mfg. Corp. v. N.J. Casino Control Comm'n, 85 N.J. 325, 338 (1981) (Handler, J., concurring).
An agency determination constitutes rule making when it is of general applicability and continuing effect and when it effects a material change in existing law. Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 328, 330 (1984) (which sets forth circumstances relevant to determinating an exercise of rule making at 331-332).
An agency determination constitutes an adjudicative proceeding when it determines legal rights and relations of specific individuals or a limited group of individuals. Texter v. Human Services Dep't, supra, 88 N.J. at 384. Adjudication is particularly appropriate when principles essential to the effective administration of the agency require adjustment to meet specific, variable, unpredictable and unforeseeable circumstances. See Securities and Exchange Comm. v. Chenery Corp., 332 U.S. 194, 202, 62 S.Ct. 1575, 1580, 91 L.Ed. 1995, 2002 (1947).
When an agency deals with a problem that is so specialized and varying in nature as to be unsuitable to confined, restrictive standards, the adjudicatory or case-by-case method is appropriate. Ibid. In such instances, the choice must be made through the exercise of the informed discretion of the administrative agency.
The choice here was for the adjudicatory process. Since the delegated standards of N.J.S.A. 5:9-11 are adequately definitive, rule making, though permissible, is unnecessary.
The legislatively delegated standards which the Director must consider in issuing agent licenses prescribe criteria that need no further definition.
*511 The goals in licensing the agents of the Lottery Commission are to serve the public convenience and to promote the sale of tickets. N.J.S.A. 5:9-8e. Four criteria of reasonable exactitude are set forth to guide the Director in exercising his authority to attain those goals. Adherence to these criteria does not involve a material change in existing law. Metromedia, Inc. v. Director, Div. of Taxation, supra, 97 N.J. at 330. The majority suggests the word "sufficiency" is too general. I do not find it so. Webster's Dictionary (9 ed. 1985) at 1179, defines "sufficiency" as "sufficient to meet one's needs ... adequacy." The word has ample precision. While petitioners challenge only the sufficiency criterion, all four make up the basis for licensing determination and must be considered together. Given their exactitude, they supplant the necessity for further delineation through rule making.
The creation and maintenance of a State lottery is not a conventional governmental activity. It is unique in comparison to any other agency activity. It is a business more like private enterprise and thus subject to the variable, unpredictable and unforeseeable circumstances of the world of private enterprise. Confinement to further exactitude than as delineated by statute would be too restrictive and would frustrate the legislative goals. There is no justification for a formula with factors to weigh as suggested by the majority.
The Director must have, to achieve the goals of the Lottery Law, wide latitude and flexibility in selecting sites for the limited number of licensed agents.
I therefore conclude that the Division of the Lottery properly exercised its adjudicatory power in the selection of licensed lottery sales agents and did not violate the APA.

CONCLUSION
I would therefore affirm the action of the Acting Director in denying petitioners' applications for lottery agent licenses and his determination that such licenses may issue on an adjudicatory *512 rather than rule-making basis. In so doing, I find no need to deal with the majority determination on promulgating rules to govern the issuing of agent licenses on the nature of an applicant's business.